OPINION
{¶ 1} Sandra J., the natural mother of D.J., appeals from a judgment granting permanent custody of D.J. to Montgomery County Children's Services (MCCS). Sandra *Page 2 
contends that the trial court's decision was improper because MCCS did not make reasonable attempts to reunify D. J. with his mother. Sandra further contends that the court should have granted custody to a qualified relative.
 {¶ 2} We conclude that the trial court acted appropriately and in the best interests of the child. D.J. had been in the temporary custody of MCCS for at least twelve months before the agency filed for permanent custody. The evidence clearly and convincingly showed that a grant of permanent custody to MCCS was in D.J.'s best interest. Sandra failed to comply with case plan requirements, including mental health treatment and counseling, and reunification was not possible because of intense conflict between the mother and child. Accordingly, the judgment of the trial court is Affirmed.
 I {¶ 3} In October 1998, MCCS filed a neglect and dependency complaint, alleging that D.J. lacked adequate parental care. MCCS had received a referral in July 1998, indicating that D.J. and his sibling, J.J., had been left home alone. Allegedly, Sandra was selling the children's food, clothing, and toys to obtain crack cocaine.
 {¶ 4} D.J. and his brother, J.J., had different fathers, and the location of D.J.'s father was unknown. A guardian ad litem (GAL) recommended in November 1998, that D.J. and his sibling, J.J., stay in the temporary care of MCCS until J.J.'s father, Edward, completed drug and alcohol assessment and any recommended treatment. The GAL also recommended that Edward receive legal custody of both boys. In December 1998, Edward was given temporary custody of J.J., but the court ordered that D.J. stay in the *Page 3 
temporary custody of MCCS, because Edward and D.J. were not related.
 {¶ 5} The original case plan listed various objectives, including that Sandra would maintain stable housing, remain drug free, adhere to a psychological and parenting assessment, and complete drug treatment and aftercare requirements. Sandra was given weekly visitation with the boys, but a GAL report filed in June 1999, indicated that the quality of the visits was marred by Sandra's frequent interrogations about people and activities in the father's home.
 {¶ 6} Eventually, in November 1999, all parties agreed that Edward should be given legal custody of both boys. MCCS retained protective supervision, and the case plan was continued. A subsequent GAL report noted that Sandra's mental health and past drug issues continued to interfere with her ability to adequately care for her children. The boys were doing well with Edward, however.
 {¶ 7} Unfortunately, Edward became ill, and passed away in February 2003. At the time, Edward and the boys were living with Edward's daughter, Monica T., who had been caring for Edward during his illness. D.J. continued to live with Monica after Edward's death, but J.J. went to live with Sandra. In September 2003, a GAL report was filed, indicating that D.J. was doing well in Monica's home. D.J. had also allegedly threatened to kill himself if he were placed back in Sandra's home. The GAL indicated that J.J. wanted to live in Sandra's home, but had begged MCCS for help because Sandra continually screamed, yelled, and threatened physical violence.
 {¶ 8} he GAL noted that Sandra had a long history of mental problems and had admitted that she had prescriptions that she did not take consistently. In fact, Sandra *Page 4 
was very agitated the day the GAL visited, because she had not taken her medication. The GAL recommended that D.J. remain with Monica, a non-relative, that Sandra and J.J. obtain family counseling, and that Sandra comply with mental health treatment, including taking medication as prescribed. The GAL further recommended that a guardian ad litem be appointed for Sandra, due to her mental health issues.
 {¶ 9} A GAL was appointed for Sandra in November 2003. In a decision filed in December 2003, the court noted that Monica was no longer willing to accept legal custody of D.J., and no relative or other non-relative was willing to accept custody. Consequently, the court granted temporary custody to MCCS. A case plan was filed with the goal of reunifying D.J. and Sandra. As part of the plan, Sandra was supposed to obtain both individual and family counseling.
 {¶ 10} A GAL report filed in June 2004, noted continuing problems. Threats of harm were being exchanged with the child (J.J.), who was currently residing in Sandra's home. Sandra had also disrupted D.J.'s placement in Monica's home by constant phone harassment, leading Monica to choose to relinquish custody rather than endure the harassment. Although Monica was still willing to have legal custody of D.J. and D.J. wanted to live with Monica, Sandra refused to consider this, because Monica was her "sworn enemy." Sandra persisted in this attitude even though the GAL explained that the arrangement would give her time with D.J. and might improve their relationship. According to the GAL, D.J. bore tremendous ill will toward Sandra and had said that he never wanted to live in her home again. Visits had recently been reinstated at MCCS, and D.J. reluctantly attended. His behavior toward his mother ranged from polite *Page 5 
distance to open hostility.
 {¶ 11} In August 2004, the court granted MCCS an extension of temporary custody. Subsequently, in October 2004, MCCS filed a motion for a second extension of temporary custody, noting that Sandra had not visited with D.J. since July 2004. MCCS also asked that visitation be terminated because D.J. was being detrimentally affected, due to uncertainty over whether visitation would occur. In addition, visitation sessions were not positive. Another GAL report in December 2004, indicated that Sandra was still inconsistent and mostly non-compliant with her prescribed medications for mental health issues. Sandra had also been in financial crisis in October 2004, and her power had been disconnected. This resulted in an emergency call for crisis intervention and a police "stand-off at Sandra's home. Sandra was arrested as a result of the stand-off and was placed on probation.
 {¶ 12} The GAL report further noted that D.J. was thirteen and remained in foster care. D.J. had not had visitation since the summer with Sandra because she had consistently cancelled. The GAL recommended another extension of temporary custody and that visitation be terminated for the time being, with the possibility of reinstatement if Sandra complied with her case plan and D.J. wanted to visit with her.
 {¶ 13} Subsequently in January 2005, MCCS filed an amended motion, asking the court to award permanent custody of D.J. to MCCS. MCCS alleged that permanent custody was in D.J.'s best interest because Sandra had failed either to complete her case plan objectives or to stabilize her mental health. Sandra had not had custody since 1998, and D.J. had said that he did not want to visit with her and did not ever want *Page 6 
to live with her again. MCCS alleged that Sandra had not consistently attended mental health treatment and had not been consistent with her medication. When Sandra was not on medication, her behavior was erratic, she suffered intense mood swings and she had difficulty communicating. MCCS also alleged that Sandra had harassed and discouraged one individual who wanted custody of D. J. and had not identified any other relatives for placement.
 {¶ 14} In April 2005, the GAL filed another report, noting that J.J. had been reporting over the past year that Sandra was using drugs and was leaving him and a young sister (C.J.) home alone all night. The prior parenting problems also persisted. The report noted that Sandra could be a responsible parent when she followed her treatment program, but that was not often the case, and the children were suffering for it. Among other things, Sandra had always maintained that it was her right not to take her medication, and had admitted that she often did not take it. The GAL observed that Monica was still willing to have D.J. on a full-time basis if Sandra would refrain from harassing her.
 {¶ 15} The GAL recommended that D.J. be placed with MCCS permanently for adoption and that relatives should apply for custody if they were interested. In addition, the GAL recommended that the two children currently in Sandra's home (J.J. and his young sister, C. J.), be removed from the home and placed with Sandra's sister, Nadine C, who lived in Florida.
 {¶ 16} The magistrate held an evidentiary hearing on May 5, 2005. The individuals testifying on behalf of the State were Dr. Jones, a clinical psychologist who *Page 7 
had treated D. J.; Linda Fischback, a family therapist who had treated Sandra, J.J. and C.J;, Jacqueline Reese, Sandra's case manager at Day-Mont Behavioral Health Care; and Ed Pitman, a caseworker from MCCS who had handled Sandra's case since 2002. Sandra also testified.
 {¶ 17} Following the hearing, the magistrate filed a decision finding that the allegations in MCCS's motion were true. The magistrate concluded that Sandra had not complied with her case plan objectives and that she had substantial mental health issues that interfered with her ability to parent D.J. In addition, the magistrate found that reunification was not possible because the parent-child conflict was so intense that Sandra and D.J. could not visit one another. Family counseling was not an option because D.J.'s therapist indicated that any interaction between D.J. and Sandra was detrimental to the child. Sandra had also failed to financially support D.J. or to visit him regularly. The magistrate found that D.J. could not and should not be placed with Sandra within a reasonable time and that granting permanent custody to MCCS was in D.J.'s best interest.
 {¶ 18} Objections to the magistrate's decision were overruled in October 2006, and this appeal followed. In March 2007, we dismissed the appeal for failure to prosecute. We then reinstated the appeal in July 2007, at Sandra's request, and expedited the appeal in October 2007.
 II {¶ 19} Sandra's single assignment of error is as follows:
 {¶ 20} "THE TRIAL COURT'S DECISION TO GRANT PERMANENT CUSTODY *Page 8 
OF * * * [D.J.] TO MONTGOMERY COUNTY CHILDREN'S SERVICES WAS IMPROPER. JULY 18, 2005 MAGISTRATE'S DECISION AND JOURNAL ENTRY; OCTOBER 12, 2006 DECISION AND ENTRY."[1]
 {¶ 21} Under this assignment of error, Sandra contends that MCCS did not make reasonable efforts to reunite D. J. with her. Sandra also claims that the trial court should have granted custody of D.J. to a qualified relative.
 {¶ 22} R.C. 2151.414 contains the requirements for granting permanent custody to a public agency. Both sides state that the trial court could properly have granted permanent custody to MCCS under R.C. 2151.414(B) if the court found at a hearing, "by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that * * * the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents." R.C. 2151.414(B)(1)(a).
 {¶ 23} As a preliminary point, we note that the trial court was not required to find that D.J. could not be placed with either parent within a reasonable time or should not be placed with the parents, because D.J. had been in MCCS's temporary custody for at least twelve months before the agency filed for permanent custody. In re C.W., 104 Ohio St.3d 163,166-167, 2004-Ohio-6411, 818 N.E.2d 1176,1179, at ¶ 21. *Page 9 
 {¶ 24} R.C. 2151.414(B)(1) provides various grounds for granting permanent custody to an agency, as follows:
 {¶ 25} "[T]he court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:
 {¶ 26} "(a) The child is not abandoned or orphaned or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
 {¶ 27} "(b) The child is abandoned.
 {¶ 28} "(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.
 {¶ 29} "(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999."
 {¶ 30} The Ohio Supreme Court has stressed that after under this statute, "an agency must, except in limited circumstances, file for permanent custody once a child has been in the agency's temporary custody for 12 or more months of a consecutive 22-month period."2004-Ohio-6411 at ]} 20. Furthermore, after the "addition of the `12 of *Page 10 
22' provision to R.C. 2151.414, an agency need no longer prove that a child cannot be returned to the parents within a reasonable time or should not be returned to the parents, so long as the child has been in the temporary custody of an agency for at least 12 months." Id. at]} 21.[2] Accord In re D.B., Montgomery App. Nos. 21856-21859,2007-Ohio-3441, at]} 18.
 {¶ 31} In the present case, MCCS was given temporary custody of D.J. on December 5, 2003. MCCS then filed its motion for permanent custody on January 4, 2005, more than twelve months later. In the entry granting permanent custody, the trial court observed that "Considering the filing date of the Permanent Custody motion, the Court finds that the child was not in the care of the agency 12 out of the last 22 months following the filing of the motion." Doc. #149, p. 2. The court then went on to find that D.J. could not be placed with either parent within a reasonable time or should not be placed with either parent, and that permanent custody with MCCS was in D.J.'s best interest.
 {¶ 32} The trial court's initial finding was incorrect, because the proper consideration is not whether the child has been in the agency's custody for 12 of the last 22 months following the filing of a permanent custody motion — the proper inquiry is whether the child has been in the agency's temporary custody "for at least 12 months of a consecutive 22-month period." C.W., 2004-Ohio-6411, syllabus. As the Ohio Supreme Court noted in C.W., *Page 11 
 {¶ 33} "The `12 of 22' provisions set forth in R.C. 2151.413(D)(1) and R.C. 2151.414(B)(1)(d) balance the importance of reuniting a child with the child's parents against the importance of a speedy resolution of the custody of a child. * * * Through the `12 of 22' provisions in the permanent-custody statutes, the legislature provides parents with 12 months to work toward reunification before an agency can institute a permanent-custody action asserting R.C. 2151.414(B)(1)(d) grounds."2004-Ohio-6411, at ]} 21 (citations omitted).
 {¶ 34} The trial court's error is harmless, however, because the court actually went on to consider more than it was required to consider — whether an award of permanent custody would be in D.J.'s best interest and would also satisfy R.C. 2151.414(B)(1)(a) because D. J. could not be placed with his parents within a reasonable time or should not be placed with his parents. In this regard, the court concluded that the custodial history of the case supported granting permanent custody to MCCS, because D. J. had been in his father's custody before the father died, and Sandra had not made substantial progress on her case plan while D. J. was in foster care.
 {¶ 35} The trial court also found that MCCS had made reasonable attempts to reunify by providing Sandra with a case plan that included mental health treatment, steps to obtain income, and counseling. However, Sandra failed to maintain mental health treatment and her mental health was not stable. In addition, the court noted that reunification was not possible within a reasonable period of time because the parent-child conflict was so intense that Sandra and D. J. could not visit with each other.
 {¶ 36} As we have noted, the trial court did not need to consider whether D.J. *Page 12 
could be placed with Sandra within a reasonable time or should be placed with her. The court only had to consider whether permanent custody was in D.J.'s best interest.
 {¶ 37} Under R.C. 2151.414(D), the best interest of the child encompasses:
 {¶ 38} "all relevant factors, including, but not limited to, the following:
 {¶ 39} "(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
 {¶ 40} "(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 {¶ 41} "(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
 {¶ 42} "(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
 {¶ 43} "(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child."
 {¶ 44} The factors in R.C. 2151.414(E)(7) through (11) include matters like: convictions of various crimes like homicide, assault and child endangerment; withholding food or medical treatment from a child; abandonment of the child; placing the child at substantial risk of harm two or more times by drug or alcohol abuse and refusal of *Page 13 
treatment; and involuntary termination of parental rights with regard to a sibling. None of these items were at issue in this case and would not have been part of the decision.
 {¶ 45} We will not reverse a trial court decision about `"parental rights and child custody unless the determination is not supported by sufficient evidence to meet the clear and convincing standard of proof.' * * * `Clear and convincing evidence is that level of proof which would cause the trier of fact to develop a firm belief or conviction as to the facts sought to be proven.'" Miller v. Greene Cty. Children's Serv.Bd., 162 Ohio App.3d 416, 420, 2005-Ohio-4035, 833 N.E.2d 805, at]} 31 (citations omitted).
 {¶ 46} The record in the present case clearly and convincingly supports the trial court's decision that an award of permanent custody is in D.J.'s best interests. The record, including the testimony at the hearing, sufficiently proves the allegations in MCCS's motion for permanent custody. D.J.'s therapist, Dr. Jones, diagnosed D.J. as having conduct disorder with a secondary diagnosis of depressive disorder, caused by the death of D.J.'s father, his placement in foster care, and negative memories of his mother's care.[3] Visits between D.J. and his mother had a negative impact, triggering memories and emotional reactions and episodes of increasing acting out. D.J. had consistently indicated that he did not want to visit his mother and did not want to return to her custody. Dr. Jones stated that he did not expect D.J. to ever reach the point where family counseling with Sandra would be effective. *Page 14 
 {¶ 47} Sandra's family counselor, Linda Fischback, testified that she saw Sandra only eight times in nine months, which was not enough counseling to demonstrate whether Sandra's parenting skills were adequate. More counseling was needed and once-a-week counseling would be ideal. However, Sandra failed to attend thirteen of the twenty-one sessions that had been scheduled.
 {¶ 48} Jacqueline Reese, Sandra's case manager at Day-Mont Behavioral Health Care, testified that Sandra had been referred to Day-Mont because she needed psychiatric medication to maintain her stability and needed therapy on an ongoing basis. Sandra had been a client with Day-Mont for a number of years and was considered an intensive client who needed to be seen two or three times per week. Sandra had to be monitored closely because she had a history of noncompliance with medication and therapy and there were many anger management issues. However, Sandra either failed to show for or cancelled quite a few appointments, including two appointments that were set with an attorney for the purpose of appealing the denial of Sandra's Supplemental Security Income (SSI) benefits. Reese indicated that Sandra had been prescribed Abilify, which is a medication used to treat bi-polar disorder. However, Sandra had not been taking her medication and was very manic lately. Reese stated that she had difficulty communicating with Sandra. According to Reese, Sandra was angry and hostile for no reason when she did not take her medication. Sandra had also not been in regular contact with her MCCS caseworker, had refused to go to appointments, and had not indicated a willingness to see her therapist.
 {¶ 49} Ed Pitman had been Sandra's ongoing MCCS caseworker since 2002. *Page 15 
Pitman testified that the current case plan was developed after Edward J. died in February 2003. Under the plan, Sandra was to comply with her treatment at Day-Mont West. She was also supposed to try and obtain SSI income, meet the basic needs of her children, recognize family problems, and seek individual and family counseling.
 {¶ 50} MCCS attempted to schedule family therapy with D. J. and his mother, but the family therapist indicated that if D.J. were so adamant about not being in his mother's presence, family therapy would not be beneficial. Pitman had also repeatedly told Sandra that she needed to take her medication in order for her behavior to improve, because when she took medication, she was not as agitated or as angry. However, Sandra felt she had the right not to take medication and that no one would force her to take medication. Like Reese, Pitman indicated that when Sandra did not take medication, she was agitated, disrespectful, angry, and paranoid.
 {¶ 51} Pitman also discussed the incident that occurred in October 2004, when Sandra's house was surrounded by the police and a S.W. AT. team for two hours. Both J.J. and C. J. were home at the time. In the two months before the hearing, J.J. had run away from home and the police had been called on many occasions because of conflict between J.J. and Sandra. MCCS had also received referrals indicating that J.J. and C.J. were not being supervised properly.
 {¶ 52} Pitman indicated that when D.J. came back into agency custody in December 2003, a visitation schedule was established for every Tuesday from 5:00 to 7:00 p.m. Sandra missed and cancelled three appointments in April 2004, and also missed visits in May 2004. No visits had taken place between D.J. and Sandra since *Page 16 
July 2004, which was almost a year before the permanent custody hearing. Visits were scheduled between July and December 2004, but Sandra did not show up. When visits had occurred prior to July 2004, they were somewhat neutral in the beginning, but then a lot of conflict occurred because Sandra engaged D. J. in different issues that he did not want to hear, like past information about his dad.
 {¶ 53} According to Pitman, MCCS had attempted to arrange placements for D. J., but Sandra had interfered. A home study was done with Monica T., but she withdrew a request for custody due to conflicts with Sandra. MCCS also wanted to explore placement with Nadine C., an aunt in Florida, but Sandra stated that she did not want to give custody of D.J. to anyone. Finally, Pitman testified that permanent custody to MCCS was in D.J.'s best interest. Pitman stated that reunification was not possible due to D.J.'s diagnosis and feelings about Sandra, and there was no bond between D.J. and his mother.
 {¶ 54} Sandra was the final witness at the hearing, but she demonstrated trouble thinking and communicating clearly. Sandra admitted not taking medication as directed, admitted that she had trouble at times waking up to get her daughter, C. J., off to school, and admitted there were a few times she had left her son and daughter home alone all night. Other parts of Sandra's testimony were, frankly, bizarre, including an exchange in which Sandra offered to take a drug test and asked both the GAL and an unidentified person in the courtroom if they had a "cup" anywhere so she could "drop now," because she had to urinate. (T. 171.) Sandra also made extraneous comments about being in pain at the moment and needing pain medication. *Page 17 
 {¶ 55} Sandra did not offer any documentation regarding the many appointments she missed and her failure to comply with case plan requirements; instead, she claimed that she had been sick a lot due to medical problems. However, the medical problems were not documented, and the Day-Mont case manager indicated that Sandra had many medical complaints but no proof of any medical illnesses. In fact, Sandra had a history of trying to get pain medications from various doctors and hospitals.
 {¶ 56} In view of the record and evidence at the hearing, the trial court correctly concluded that granting permanent custody to MCCS was in D.J.'s best interest.[4]
 {¶ 57} As a final matter, Sandra contends that MCCS failed to consider placing D.J. with relatives. Sandra acknowledges that this is not a requirement, but contends that placement with relatives would have been in D.J.'s best interest because it would have allowed him to remain in contact with his siblings.
 {¶ 58} We have previously indicated that placement with a relative is not an express statutory requirement, but is something that could arguably be considered in determining what is in the best interest of the child. In re C.W., Montgomery App. No. 20140, 2004-Ohio-2040, at]} 35 (referring to the "best interest" factor found in R.C.2151.414(D)(1), which requires consideration of the "interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home *Page 18 
providers, and any other person who may significantly affect the child.")
 {¶ 59} The record indicates that MCCS did consider placements that would allow D. J. to maintain contact with his siblings. However, Sandra had sabotaged the custody arrangement with Monica T., and had also rejected MCCS's attempts to investigate custody with Sandra's sister, Nadine. In this regard, Sandra stated that she would not give custody of D.J. to anyone. Under the circumstances, MCCS cannot be said to have failed to consider placement with a relative.
 {¶ 60} Sandra J.'s single assignment of error is overruled.
 III {¶ 61} Sandra J.'s single assignment of error having been overruled, the judgment of the trial court is Affirmed.
BROGAN, J., and GRADY, J., concur.
[1] We have altered Sandra's assignment of error to remove a reference to D.J.'s given name. We use initials of children and first names of adults to protect the privacy of the parties.
[2] Amendments to R.C. 2151.414 became effective in March 1999, and the Ohio Supreme Court was interpreting the language that was added to the statute.
[3] The parties and the court have referred to Edward as D.J.'s "father," because of the parental role that Edward assumed before his death. However, there is no dispute that the identity of D.J.'s real father was unknown.
[4] We have noted that the trial court did not need to consider whether D.J. could be placed with Sandra within a reasonable time or should be placed with Sandra. However, if we were to consider this issue, we would affirm the trial court's conclusion on this issue, as well. The record clearly and convincingly demonstrates that D.J. could not be placed with Sandra within a reasonable time and should not be placed with Sandra. *Page 1