[Cite as *In re N.D.*, 2020-Ohio-3203.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

IN RE N.D.

:
:
:     Appellate Case No. 28687
:
:     Trial Court Case No. 2017-1063
:
:     (Appeal from Common Pleas Court-
:     Juvenile Division)
:
:

. . . . . . . . . . .

O P I N I O N

Rendered on the 5th day of June, 2020.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by SARAH E. HUTNIK, Atty. Reg. No. 0095900, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
       Attorney for Appellee, Montgomery County Children Services

GREGG R. LEWIS, Atty. Reg. No. 0041229, 625 City Park Avenue, Columbus, Ohio 43206
       Attorney for Appellant, Father

. . . . . . . . . . . . .

TUCKER, P.J.

**{¶ 1}** Appellant, Father, appeals from a judgment granting permanent custody of his minor child, N.D., to Montgomery County Children Services ("MCCS"). Father contends the grant of permanent custody was erroneous because MCCS failed to make reasonable efforts to effectuate reunification. He further contends the record does not support the juvenile court's finding that the grant of permanent custody to MCCS was in the child's best interest. For the reasons set forth below, we affirm.

## I.      Facts and Procedural History

**{¶ 2}** Mother[1] gave birth to N.D. on January 29, 2017. Mother identified Father as the putative father. At the time of the birth, Mother was homeless, had no income, and was taking Suboxone for treatment of her heroin and opioid addiction. After he was born, N.D. tested positive for Suboxone and was diagnosed with neonatal abstinence syndrome. Because N.D. was exhibiting symptoms of withdrawal, he was placed in the neonatal intensive care unit and treated with morphine.

**{¶ 3}** MCCS became involved with Mother and N.D. while the child remained in the hospital. On February 22, 2017, MCCS filed a dependency complaint and a motion for interim temporary custody. The motion for interim temporary custody was granted. N.D. was released from the hospital on February 22, 2017 and placed in foster care. That same month, MCCS notified Father that he had been identified as the putative father. MCCS provided Father with information to establish paternity and custody.

**{¶ 4}** N.D. was adjudicated dependent on March 16, 2017. That same month, the child's guardian ad litem ("GAL") contacted Father. Father indicated he did not want to

---

[1] Mother is not a party to this appeal.

be involved in the matter because he did not believe he was the child's father. He told the GAL not to contact him again. According to the GAL, Father spoke erratically and his words were slurred. A few days later, Father left a voice message for the GAL instructing her not to contact his wife. The GAL indicated Father sounded intoxicated.

{¶ 5} On December 22, 2017, MCCS filed a motion seeking a first extension of temporary custody. That same month, the caseworker for MCCS again contacted Father, who stated he had not taken steps to establish paternity because he did not want to pay child support. The caseworker informed him that a status hearing would be conducted on January 23, 2018. Father appeared at the hearing, and the juvenile court set a March 2018 hearing date for MCCS's motion for a first extension of temporary custody. At that time, the caseworker spoke with Father and learned that he had decided to pursue paternity testing. The caseworker therefore attempted to set up an appointment with Father to conduct a home visit and discuss a case plan. Father declined and informed the caseworker he did not want to meet with her until the paternity test results were received.

{¶ 6} The GAL had contact with Father in March 2018. Father appeared at the GAL's office and indicated he wanted to establish paternity. He told the GAL he had been delayed in establishing paternity because he worked out of state and was dealing with personal problems. He also explained the delay by stating he thought Mother was trying to "trap him." Tr. p. 26. He informed the GAL the delay "had a lot to do with his marriage," as the child was "born out of wedlock."[2] *Id.* The GAL explained her role in the matter and asked to interview Father. Father denied current substance abuse but

---

[2] At the time of N.D.'s birth, Father had been married to his wife for almost 20 years.

indicated he had a prior history of cocaine use. He also indicated his wife would take care of N.D. when he was working out of state. After approximately five minutes, Father ended the interview and left the office. According to the GAL, Father felt the matter was "none of [her] business" despite the fact that she had explained her role to him. Tr. p. 22.

{¶ 7} A first extension of temporary custody was granted on March 5, 2018. Paternity was established in May 2018. Thereafter the caseworker attempted to contact Father to again set up a home visit and a time to discuss a case plan. Father informed the caseworker that he had an out of state job pending and could not commit to an appointment time. The caseworker asked Father to provide dates he would be available. Father did not respond. A week later, the caseworker e-mailed Father to again seek a date for an appointment. Father then notified her he had received the out of state job offer and would not be able to meet with her. He further stated he would only be available on Saturdays and Sundays for visitation with N.D.

{¶ 8} The caseworker informed Father that MCCS was not able to conduct visitations on weekends. She offered to adjust her work schedule to accommodate visitation early on Mondays or late on Friday evenings. She also discussed and made a referral to Erma's House for visitation. The caseworker also offered visitation through the foster parents.

{¶ 9} A home visit was arranged for May 25, 2018. The caseworker noted that the bedroom designated for N.D.'s use was used for storage and had one path for walking into the room. The caseworker also noted the entire house was cluttered and discussed with Father the need to "babyproof" the home for N.D.'s safety. Tr. p. 140. Father

indicated he had not done so for his other children and did not see the need to do so for N.D.

{¶ 10} In June 2018, the caseworker was able to arrange another meeting with Father. A case plan was established which required Father to undergo mental health and substance abuse assessments. The plan also required Father to visit with N.D., sign all requested releases and undergo random drug screening. Father then informed the caseworker he would be in town on Thursday, July 13. The caseworker and foster parents arranged to provide him with a two-hour visit on that date.

{¶ 11} MCCS filed a motion for permanent custody on July 18, 2018. That same month, the GAL made arrangements to visit Father's home. The home, a two-bedroom duplex, was clean but cluttered. There were automobile tires in the hallway. Father's wife indicated one bedroom was hers. The second bedroom had no bed, was used for storage, and was difficult to walk through. The wife indicated she was not willing to take care of N.D. The wife also indicated Father currently used drugs.

{¶ 12} Father filed a motion for legal custody on August 20, 2018. MCCS was able to arrange two more visits between Father and N.D. in September 2018 and a fourth visitation on October 18, 2018.

{¶ 13} A hearing on MCCS's motion for permanent custody and Father's motion for custody was conducted on October 25, 2018. Thereafter, the magistrate issued a decision granting permanent custody to MCCS. Father filed objections to the magistrate's decision, which were overruled by the juvenile court. The court granted permanent custody to MCCS on January 10, 2020. Father appeals.

## II.     Standard of Review

{¶ 14} "In a proceeding for the termination of parental rights, all the court's findings must be supported by clear and convincing evidence." (Citations omitted.)  *In re E.D.*, 2d Dist. Montgomery No. 26261, 2014-Ohio-4600, ¶ 7.  In Ohio, "clear and convincing evidence" is defined as "that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established."  *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus. Thus, a juvenile court's judgment terminating parental rights will not be overturned "if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established." (Citations omitted). *In re A.U.*, 2d Dist. Montgomery No. 22264, 2008-Ohio-186, ¶ 15.

## III.     N.D.'s Best Interests

{¶ 15} We begin with the second assignment of error asserted by Father, which states as follows:

THE TRIAL COURT ERRED, [AND] ABUSED ITS DISCRETION BY GRANTING PERMANENT CUSTODY OF THE MINOR CHILD TO THE MONTGOMERY COUNTY DEPARTMENT OF JOB AND FAMILY SERVICES – CHILDREN SERVICES DIVISION BECAUSE THE EVIDENCE WAS NOT CLEAR AND CONVINCING THAT PERMANENT

CUSTODY WAS IN THE CHILD'S BEST INTEREST.

{¶ 16} Father asserts the evidence demonstrated that the child's best interest was not served by granting permanent custody to MCCS. In support, he contends he "worked hard in order to complete the objectives of his case plan" and deserved "the chance to raise his son." He further claims he is able to provide a stable home and a "loving and nurturing environment for [N.D.] to grow up in."

{¶ 17} R.C. 2151.414(B)(1) states, in pertinent part, that:

Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:

* * *

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *.

{¶ 18} There was no dispute that N.D. had been in the temporary custody of MCCS for 12 or more months of a consecutive 22-month period, and therefore MCCS only needed to establish that an award of permanent custody to the agency was in N.D.'s best interest.[3] R.C. 2151.414(D) provides that, in determining the best interest of a child, the

---

[3] Recently, the Supreme Court clarified that the 12 out of a continuous 22-month period set forth in R.C. 2151.414(B)(1)(d) does not require 22 months of agency involvement. *In re N.M.P.*, Ohio Slip Opinion No. 2020-Ohio-1458, ___ N.E.3d ___, ¶ 24.

court shall consider all relevant factors, including, but not limited to, the following:

(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period * * * ;

(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 19} The juvenile court discussed the interaction of the child with Father and the foster parents and concluded this factor weighed in favor of granting custody of the child to MCCS. The court noted testimony that the foster parents and four foster siblings love N.D. and that he was very bonded to the family. N.D. referred to the foster parents as "mom" and "dad." Tr. p. 142. N.D. and his youngest foster sibling were very close and had "really good sibling interaction." Tr. p. 142. The foster family had been able to meet the medical needs of N.D., which included continuous follow-up appointments with Cincinnati Children's Hospital Neonatal Abstinence Syndrome Center. N.D. had been

achieving his developmental milestones in a timely manner. The juvenile court noted Father exercised visitation with the child on only four occasions, and there was no evidence the child had any bond to him. During his visitations with the child, Father's interactions with N.D. were appropriate; however, he spent most of the visitation time talking to the foster parents or caseworker rather than engaging with N.D. After viewing the evidence in its entirety, we have no basis to question the court's decision in this regard.

{¶ 20} The juvenile court made no finding as to the child's wishes. N.D. was less than two years old at the time of the hearing and would not have been able to express his wishes. As a result, this factor was not weighed for or against granting permanent custody to MCCS.

{¶ 21} The trial court concluded that the custodial history factor weighed in favor of granting custody to MCCS. In this regard, the court commented that the child had been in foster care with the same family since he was released from the hospital shortly after birth. As noted, N.D. was placed in MCCS's custody only a few weeks after he was born and had continuously remained in such custody. He had been with the same foster family for 19 months at the time of the hearing, and the foster family wished to adopt N.D. N.D. had never lived with either Mother or Father and had had visitation with Father on only four occasions. We conclude the record supported the juvenile court's finding that this factor weighs in favor of permanent custody.

{¶ 22} Concerning the need for legally secure placement, the trial court concluded such a placement could not be achieved without granting permanent custody to MCCS, and the GAL recommended the juvenile court grant permanent custody to MCCS. The

record shows Father was employed out of state at a location in West Virginia more than two and a half hours away from his Dayton residence. Father testified he got up at 4:00 a.m. each Monday to leave for work. He further testified he stayed in a hotel Monday through Friday and returned to Dayton for the weekend. Father suggested his wife would care for the child during the week while he was away at work; however, the wife informed the GAL and the caseworker that she was not willing to take care of N.D.[4] Alternatively, Father suggested that he could pay the foster family to watch the child during the week. Finally, he suggested the impractical notion he could return home from work every night. Simply put, he had no clear plan for providing care for N.D. The record also shows that Father had not, as of the time of the hearing, taken any action to make his home safe for a young child, nor had he decluttered the home or turned the second bedroom into a usable space for the child.

{¶ 23} The court also concluded Father had not complied with his case plan. Specifically, the record shows the agency wanted Father to undergo substance abuse and mental health assessments based on his acknowledgment of prior drug use, his wife's assertion that he was currently using drugs, and Mother's claims that Father was not mentally stable. Further, at one point, Father caused the caseworker to question his mental stability after he sent an e-mail to her in which he accused the caseworker of informing Mother of "all the information that he spoke with me about [and indicated] that the mother's pimp knows about this, and now we're all in danger; the foster parents are

---

[4] MCCS and the GAL were unable to investigate Father's wife, as they were not able to obtain signed releases for this purpose. The wife did not appear at the hearing despite having been asked to do so by Father. Thus, no information was available as to the suitability of placing N.D. in a home with the wife.

in danger, and I'm in danger." Tr. p. 129. He also told the caseworker he was "afraid for the child to go back to the mother because somebody would kidnap his child for ransom." *Id.*

{¶ 24} MCCS made referrals for the assessments and Father attended. After the assessments, no further treatment was recommended. However, it appears from the record that Father was not truthful during the assessments and refused to take a screening assessment test. The caseworker learned Father had downplayed his prior drug use by telling the evaluator he had only used cocaine around the time N.D. was conceived. Father had previously told the caseworker he had a 30-year history of using crack cocaine. The caseworker also learned Father told the evaluator he did not currently use drugs. However, Father's wife informed the caseworker and the GAL that Father still used drugs, but she did not view it as a problem as he was able to hold a job.

{¶ 25} Based upon the record before us, we cannot say the trial court erred in finding this factor weighed in favor of granting custody to MCCS. Father failed to complete his case plan. He also did not have a safe place for the child to live. Father lived in another State during the work week and had no plan for providing care for the child during that time. Thus, there was no evidence he could meet the child's need for a legally secure placement.

{¶ 26} We conclude the juvenile court properly weighed the pertinent factors in R.C. 2151.414(D) and (E) and reasonably found, by clear and convincing evidence, that granting permanent custody to MCCS was in the child's best interest. Accordingly, Father's second assignment of error is overruled.

## IV.    Reunification Efforts

**{¶ 27}** M.D.'s first assignment of error states as follows:

THE TRIAL COURT ERRED, ABUSED ITS DISCRETION AND RULED AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE WHEN IT RULED THAT MONTGOMERY COUNTY DEPARTMENT OF JOB AND FAMILY SERVICES – CHILDREN SERVICES DIVISION MADE REASONABLE EFFORTS TO EFFECTUATE REUNIFICATION WITH THE MINOR CHILD'S FATHER.

**{¶ 28}** Father asserts he was making significant progress toward completing his case plan but was not provided "a reasonable amount of time" to "further comply." Thus, he disputes that MCCS made a reasonable effort to reunify him with N.D.

**{¶ 29}** Contrary to Father's suggestion, if, as here, a child has been in an agency's temporary custody for 12 months of a continuous 22-month period, the "reasonable efforts" provision of R.C. 2151.419(A)(1) is not implicated. *In re D.J.*, 2d Dist. Montgomery No. 21906, 2007-Ohio-6677, ¶ 23. Instead, the only issue was whether there was clear and convincing evidence that granting permanent custody to MCCS was in the child's best interest. R.C. 2151.414(B)(1). But if reasonable efforts at reunification (actually, in this case, unification) had been required, this requirement would have been met.

**{¶ 30}** "Reasonable efforts are described as being a good faith effort which is 'an honest, purposeful effort, free of malice and the desire to defraud or to seek an unconscionable advantage.' " (Citations omitted.) *In re Erin Secrest*, 2nd Dist. Montgomery No. 19378, 2002-Ohio-7094, ¶ 13. "The issue is not whether [the agency]

could have done more, but whether it did enough to satisfy the 'reasonableness' standard under the statute." *Id.*, quoting *In re Smith*, 2d Dist. Miami No. 2001-CA-54, 2002 WL 538888 (Apr. 12, 2002).

**{¶ 31}** The juvenile court noted a reasonable efforts determination was made on August 6, 2018. That finding was not appealed. Nevertheless, the juvenile court stated it would address the issue "in an overabundance of caution." The court noted MCCS had provided "case management, information and referral, home study, and substitute care." *Id.* The court further found the record supported a finding that MCCS made reasonable efforts to make it possible to place N.D. with Father.

**{¶ 32}** As stated, the record shows MCCS first contacted Father in February 2017 in an attempt to involve him in the proceedings. MCCS also provided him with instructions for determining paternity and intervening in the custody case. The GAL attempted to involve Father in the proceedings as early as March 2017. Father advised MCCS and the GAL that he was not interested in establishing paternity. Father then waited until January 2018 to take action to establish paternity and intervene in the proceeding. At that point, N.D. had already been in the temporary custody of MCCS for nine months. Father further admitted he did not meet with the caseworker, despite requests to do so, until June 2018. This record demonstrates Father was aware he was the putative father and was aware of the steps he needed to take to join the proceeding for approximately 14 months before he submitted to a meeting with the caseworker. Clearly, he could have engaged in the matter much earlier but elected not to do so.

**{¶ 33}** We further note that, during his testimony, Father admitted MCCS made appropriate referrals for him. The record also shows MCCS explored several different

avenues in order to facilitate visitation between N.D. and Father. The caseworker even volunteered to work outside of her normal hours in order to accommodate Father's schedule. Despite the agency's efforts, Father only exercised visitation a total of four times over the course of the four months prior to the hearing.

{¶ 34} The caseworker also conducted home visits with Father and advised of actions he needed to take before the home could be approved for N.D. Father admitted he made no effort to resolve the problems with the home even though, as he stated, doing so would have been simple and easy.

{¶ 35} Based upon this record, we agree with the juvenile court that MCCS made reasonable efforts to make it possible for N.D. to be placed with Father. We further find Father's claim that he was not given a reasonable time in which to meet his case plan requirements lacking in merit. Accordingly, the first assignment of error is overruled.

## V.    Conclusion

{¶ 36} Both of Father's assignments of error being overruled, the judgment of the juvenile court is affirmed.

. . . . . . . . . . . . .

DONOVAN, J. and FROELICH, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Sarah E. Hutnik
Gregg R. Lewis
Jeffrey Livingston
Cynthia Westwood
Patty Vranesie
Hon. Anthony Capizzi