[Cite as *In re M.T.*, 2020-Ohio-2950.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In the matter of: [M.T.], | : | |
| | | No. 19AP-344 |
| [C.L., | : | (C.P.C. No. 16JU-14266) |
| Appellant]. | : | (REGULAR CALENDAR) |
| In the matter of: [C.T.] et al., | : | |
| | | No. 19AP-345 |
| [C.L., | : | (C.P.C. No. 16JU-14267) |
| Appellant]. | : | (REGULAR CALENDAR) |

D E C I S I O N

Rendered on May 14, 2020

**On brief:** *Robert J. McClaren,* for appellee Franklin County
Children Services*.*

**On brief:** *James Sweeney Law, LLC,* and *James S. Sweeney*,
for appellant.

APPEALS from the Franklin County Court of Common Pleas,
Division of Domestic Relations and Juvenile Branch

LUPER SCHUSTER, J.

{¶ 1} Appellant, C.L., mother of M.T., C.T., A.T., and L.T.J. ("mother"), appeals
from the judgment of the Franklin County Court of Common Pleas, Division of Domestic
Relations and Juvenile Branch, terminating her parental rights and placing these children
in the permanent custody of appellee, Franklin County Children Services ("FCCS"). For the
following reasons, we affirm.

## I. Facts and Procedural History

{¶ 2} In October 2017, FCCS moved for permanent custody of M.T., C.T., A.T., and L.T.J. In June 2018, FCCS again moved for permanent custody of these children. FCCS's request for permanent custody was heard before the trial court in April 2019.[1]

{¶ 3} To begin the permanent custody hearing, the trial court conducted an in camera interview with each child. Fifteen-year-old M.T. stated that she did not want to return home to her parents; instead, she wanted to stay with her foster mother and be adopted by her. M.T. indicated that she gets along fine with her siblings and expressed her wish to stay with them. Eleven-year-old C.T. stated that he wanted to remain with his foster mother, even though he had previously indicated a desire to go back to his parents. A "gut feeling" caused C.T. to change his mind, and he also stated that he wanted to stay with his siblings. (Apr. 19, 2019 Tr. at 30, filed Sept. 12, 2019.) Ten-year-old A.T. stated she wanted to stay with her "mom and dad" and with her siblings. (Tr. at 41.) She also indicated she liked being in her foster home. Finally, six-year-old L.T.J. indicated to the trial court that he would like to live with his mom and dad, but that he would prefer to stay with his foster mother. And like the other children, L.T.J. expressed a desire to live with his siblings.

{¶ 4} Mother testified as follows. FCCS removed mother's four children from her care in November 2016, but she was not sure of the reason for the removal. This was not the first time the three older children were removed from mother's home. FCCS removed these three children from mother's home in 2009, and they were returned to her in 2011. At that time, mother completed domestic violence and mental health counseling. Mother's 2016 case plan required her to drop urine screens, complete alcohol and other drug ("AOD") classes, complete domestic violence classes, maintain housing, and visit her children. In January 2017, mother completed an AOD assessment, which recommended she undergo outpatient treatment. Mother began this treatment but stopped going because she was frustrated with not being able to visit her children more often. She completed additional AOD assessments in February and August 2018 and began the recommended outpatient treatment. But as of the trial date, mother had not completed that treatment.

---

[1] Before the start of trial, FCCS withdrew its October 2017 permanent custody motion, and the matter therefore proceeded on FCCS's June 2018 permanent custody motion.

Mother also acknowledged at trial that she missed most of the required random drug screens. Mother denied having an alcohol problem.

{¶ 5} Mother further testified that she was the victim of domestic violence perpetrated by L.T., the father of her children and with whom she had been with for almost 19 years ("father"),[2] as well as by her mother and her cousin. As a result of domestic violence charges against father in January 2018, he was ordered to stay away from her. This order was still in effect as of the time of trial. As to the domestic violence component of mother's case plan, she completed a domestic violence assessment a few weeks before the start of the trial. The assessor recommended that mother complete a 26-week domestic violence program. At the time of trial, mother had not completed the domestic violence component of the FCCS case plan.

{¶ 6} Father testified as follows. The case plan required father to complete domestic violence and AOD assessments and to complete random drug screens. Father acknowledged he had not completed most of his random drug screens, a domestic violence assessment, or his recommended drug treatment. In January 2018, father was convicted of committing aggravated menacing and domestic violence threats against mother, resulting in the stay-away order. Despite the stay-away order, father and mother continued to reside together. In May 2018, father was convicted of OVI, with a blood alcohol concentration of .195. At trial, father denied having an alcohol problem.

{¶ 7} FCCS caseworker Martia Reed testified that M.T., C.T., A.T., and L.T.J., have been in FCCS's custody since they were removed from their parents' care in November 2016 because of concerns regarding domestic violence and alcohol use. Since their removal, the children have been in multiple foster placements, and they have been diagnosed with post-traumatic stress disorder due to the domestic violence and alcohol use in their parents' home. As part of the case plan, mother and father were, among other things, required to complete AOD and domestic violence assessments and follow through with the resulting recommendations, and to complete clean random drug screens. Mother did not complete the recommendations resulting from the AOD and domestic violence assessments. As to

---

[2] L.T. signed affidavits acknowledging his paternity as to each of the four children. At the permanent custody hearing, B.W. was named as a possible biological father of C.T. Despite being served with notice, B.W. did not appear at the hearing.

the drug screens, mother completed only 30 out of the required 349, and almost every screen she did complete tested positive for alcohol. One tested positive for marijuana. Like mother, father did not complete the case plan requirements relating to drug screening and AOD and domestic violence treatment.

{¶ 8} Reed also testified that the children are bonded with their parents, each other, and the current foster parents. However, Reed expressed her concern about the children returning to live with their parents because the alcohol issues remained unresolved, and the domestic violence problems continued between the parents.

{¶ 9} Victoria Ullmann, the guardian ad litem for the children, testified that she observed appropriate interactions between the children and their parents, and she had positive interactions with the parents. But she remained concerned because of the parents' "Jekyll-and-Hyde" behavior that results from their drinking. (Tr. at 97.) She testified that the wishes of the children were also important in her custody recommendation analysis. She testified that M.T. has been the most consistent in expressing a desire not to return home to her parents. C.T. indicated to Ullman that he wanted his parents to take the necessary steps for reunification, but ultimately he expressed a desire to stay with the foster parents. A.T. had expressed her desire to stay with the foster parents but also indicated she wanted to return to her parents. As to the youngest child, L.T.J., Ullmann did not believe he was old enough to express an opinion regarding his placement. Based on her assessment of what is in the best interest of the children, Ullmann recommended that the trial court grant FCCS's request for permanent custody.

{¶ 10} Following trial, the court issued a written decision granting FCCS's request for permanent custody of M.T., C.T., A.T., and L.T.J. The trial court considered each of the factors in R.C. 2151.414(D) and determined there was clear and convincing evidence that it was in the best interest of these children to grant the request. Mother timely appeals.

## II. Assignment of Error

{¶ 11} Mother assigns the following error for our review:

> The trial court's finding that FCCS's motion for permanent custody was supported by clear and convincing evidence was against the manifest weight of the evidence.

### III.  Standard of Review

{¶ 12}  "In reviewing a judgment granting permanent custody to FCCS, an appellate court 'must make every reasonable presumption in favor of the judgment and the trial court's findings of facts.' " *In re J.T.*, 10th Dist. No. 11AP-1056, 2012-Ohio-2818, ¶ 8, quoting *In re P.G.*, 10th Dist. No. 11AP-574, 2012-Ohio-469, ¶ 37.  " '[I]f the evidence is susceptible of more than one construction, we must give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the [juvenile] court's verdict and judgment.' " *In re Brooks*, 10th Dist. No. 04AP-164, 2004-Ohio-3887, ¶ 59, quoting *Karches v. Cincinnati*, 38 Ohio St.3d 12, 19 (1988).  "Judgments are not against the manifest weight of the evidence when all material elements are supported by competent, credible evidence." *J.T.* at ¶ 8.

### IV.  Discussion

{¶ 13}  In mother's sole assignment of error, she asserts the trial court's decision to grant permanent custody of M.T., C.T., A.T., and L.T.J. to FCCS was against the manifest weight of the evidence.  Mother generally contends the granting of permanent custody was not in the children's best interest.  This assignment of error lacks merit.

{¶ 14}  "Parents have a constitutionally-protected fundamental interest in the care, custody, and management of their children." *In re H.D.*, 10th Dist. No. 13AP-707, 2014-Ohio-228, ¶ 10, citing *Troxel v. Granville*, 530 U.S. 57, 65 (2000).  The Supreme Court of Ohio recognizes the essential and basic rights of a parent to raise his or her child. *In re Murray*, 52 Ohio St.3d 155, 157 (1990).  However, these rights are not absolute, and a parent's natural rights are subject to the ultimate welfare of the child. *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979).  In certain circumstances, therefore, the state may terminate the parental rights of natural parents when such termination is in the best interest of the child. *H.D.* at ¶ 10, citing *In re E.G.*, 10th Dist. No. 07AP-26, 2007-Ohio-3658, ¶ 8, citing *In re Harmon*, 4th Dist. No. 00 CA 2694, 2000 Ohio App. LEXIS 4550 (Sept. 25, 2000); *In re Wise*, 96 Ohio App.3d 619, 624 (9th Dist.1994).

{¶ 15}  In deciding to award permanent custody, the trial court must take a two-step approach. *In re K.L.*, 10th Dist. No. 13AP-218, 2013-Ohio-3499, ¶ 18.  The court must first determine if any of the factors set forth in R.C. 2151.414(B)(1) apply. *Id.*  The fourth factor described in R.C. 2151.414(B)(1) is that "[t]he child has been in the temporary custody of

one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period."  R.C. 2151.414(B)(1)(d).  Here, there is no dispute that M.T., C.T., A.T., and L.T.J. were in the temporary custody of FCCS for 12 or more months of a consecutive 22-month period.  Thus, the statutory factor in R.C. 2151.414(B)(1)(d) was established.

{¶ 16} Once the trial court determines that one of the circumstances in R.C. 2151.414(B)(1) applies, it must then determine whether "clear and convincing" evidence demonstrates that a grant of permanent custody is in the child's best interest.  *In re A.J.*, 10th Dist. No. 13AP-864, 2014-Ohio-2734, ¶ 16; R.C. 2151.414(B)(1).  "Clear and convincing evidence is that degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the facts to be established."  *K.L.* at ¶ 14.  "It is more than a mere preponderance of the evidence but does not require proof beyond a reasonable doubt."  *Id.*

{¶ 17} In determining the best interest of a child, R.C. 2151.414(D)(1) requires the trial court to consider all relevant factors including, but not limited to, the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in [R.C. 2151.413(D)(1)], the child was previously in the temporary custody of an equivalent agency in another state;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

> (e) Whether any of the factors in [R.C. 2151.414(E)(7) to (11)]
> apply in relation to the parents and child.

R.C. 2151.414(D)(1)(a) through (e). R.C. 2151.414(D) does not give any one factor "greater weight than the others." *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, ¶ 56.

{¶ 18} The evidence at trial supported the trial court's determination that granting permanent custody to FCCS was in each child's best interest. Under R.C. 2151.414(D)(1)(a), in making its best interest determination, the trial court must consider the interactions and relationships between the child and the individuals in the child's life, including the child's parents, siblings, relatives, and "any other person who may significantly affect the child."

{¶ 19} Here, the evidence demonstrated a strong bond between the parents and each of their children. And the children have a strong bond to each other. During the parents' separate visits with the children at FCCS, each parent interacted appropriately with the children and mutual bonding was observed. While neither parent appeared intoxicated at visits, the matter did not progress to home visits. There was also evidence that the children were repeatedly moved from one foster home to another due to various problems; however, the evidence also indicated that the foster home at the time of trial was a stable and loving environment. Even though the children began residing in that home only a few weeks before the trial, the present foster mother previously had been a respite provider for the children. The evidence demonstrated that the children are well-cared for and loved in the current foster placement, and the children have expressed an especially strong affinity toward their new foster mother.

{¶ 20} R.C. 2151.414(D)(1)(b) required the trial court to consider the wishes of each child, expressed either directly by the child or through the child's guardian ad litem. Before hearing testimony from witnesses, the trial court conducted an in camera interview with each of the four children. Each child expressed a desire to stay together as siblings. Fifteen-year-old M.T. indicated that she wanted to be adopted by her foster mother and not to return home to her parents. Eleven-year-old C.T. changed his mind as to returning to live with his parents and expressed to the trial court his wish to remain with his current foster mother. Ten-year-old A.T. was more equivocal, stating both that she wanted to live with her parents and that she liked staying in her foster home. Similarly, six-year-old L.T.J. indicated to the trial court that he would like to live with his mom and dad but that he would

prefer to stay with his foster mother. However, based on L.T.J.'s age and his limited ability to verbally communicate with the trial court, the trial court reasonably found that he was too young and immature to understand the concepts of permanency and adoption. The guardian ad litem recommended the trial court grant FCCS's request for permanent custody of all four children.

{¶ 21} R.C. 2151.414(D)(1)(c) required the trial court to consider the custodial history of the children. For the purpose of this division, the children entered the temporary custody of FCCS in January 2017, and they had been in the continuous custody of FCCS since that time. *See* R.C. 2151.414(D) ("For the purposes of division (D)(1) of this section, a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home.").

{¶ 22} R.C. 2151.414(D)(1)(d) addresses the children's need for legally secure permanent placement and required the trial court to consider whether this can be achieved without a grant of permanent custody to the agency. *In re D.P.*, 10th Dist. No. 06AP-780, 2007-Ohio-1703, ¶ 16. Here, the trial court concluded that a legally secure permanent placement could not be achieved without a grant of permanent custody to FCCS. The evidence supported this conclusion.

{¶ 23} As discussed above, the evidence demonstrated that, during the children's temporary custody with FCCS for the prior two years, they had multiple poor foster family experiences, causing them to be repeatedly moved. Only a few weeks before the trial, the children had been placed together in a stable, loving foster home. The trial court noted how the children suffered from this instability and reasonably found that the children were in great need of a legally secure placement.

{¶ 24} The evidence also supported the trial court's finding that the children should not be returned to mother or father. The primary reason for the children's removal from their parents' home was the abuse of alcohol and associated domestic violence problems. Consequently, the case plan required the parents to take the appropriate and necessary steps to eliminate these issues. These requirements included the parents undergoing assessments and following through with the treatment recommendations. But neither parent complied with these components of the case plan. Both parents completed AOD

assessments, but neither completed all the recommended classes. And even though both parents were also required to undergo random drug screens, they only completed a fraction of the requested screens. In almost every screen they did complete, they tested positive for alcohol. Additionally, father was convicted of an OVI offense in March 2018. Despite all of this, both parents continued to deny having alcohol problems.

{¶ 25} As to the domestic violence issue, the evidence showed that neither parent completed the domestic violence component of the case plan. Mother delayed the completion of her domestic violence assessment until a few weeks before the start of trial, and thus she did not complete the 26-week program that was recommended as part of that assessment. Father did not compete a domestic violence assessment. Thus, both parents failed to complete the domestic violence component of the case plan. Additionally, in connection with the domestic violence assessment in April 2019, mother reported that her partner was "emotionally, physically, and sexually abusive." (Ex. 9, attached to Apr. 18, 2019 Tr., filed Sept. 12, 2019.) Further evidence indicated that, in November 2017, the FCCS caseworker noticed mother had a black eye, and mother identified father as having caused this injury to her. In January 2018, father was convicted of committing domestic violence crimes against mother, and he was ordered to stay away from mother. Despite the stay-away order, the two continued to live together. Simply stated, the alcohol and domestic violence issues were unresolved and continued.

{¶ 26} Therefore, evidence in the record supported the trial court's finding that a legally secure permanent placement could not be achieved for the children without an order of permanent custody to FCCS.

{¶ 27} Lastly, under R.C. 2151.414(D)(1)(e), the court was required to consider any applicable factors set forth in R.C. 2151.414(E)(7) through (11), which include (1) whether the parent has been convicted of or pled guilty to certain crimes; (2) whether the parent withheld medical treatment or food from the child; (3) whether the parent has placed the child at a substantial risk of harm due to alcohol or drugs; (4) whether the parent has abandoned the child; and (5) whether the parent has had parental rights terminated with respect to a sibling of the child. Here, the trial court found that no evidence was offered pertinent to the factors listed in this provision, except that the alleged biological father of

C.T., B.W., had abandoned this child.  Mother does not challenge the trial court's finding as to this division.

{¶ 28}  In sum, we find the trial court thoroughly reviewed and weighed the evidence in relation to all factors relevant to determining whether granting permanent custody to FCCS was in the best interest of M.T., C.T., A.T., and L.T.J.  And we further find that competent, credible evidence supported the trial court's conclusion that granting permanent custody to FCCS was in each child's best interest.  Because the trial court's decision to grant permanent custody was not against the manifest weight of the evidence, we overrule mother's sole assignment of error.

## V.  Disposition

{¶ 29}  Having overruled mother's sole assignment of error, we affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations and Juvenile Branch.

*Judgment affirmed.*

BRUNNER and NELSON, JJ., concur.