[Cite as *In re B.R.*, 2021-Ohio-2324.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In the Matter of: | : | |
| | | No. 20AP-117 |
| B.R. aka B.R., | : | (C.P.C. No. 18JU-3347) |
| (B.R., | : | (REGULAR CALENDAR) |
| Appellant). | : | |

D E C I S I O N

Rendered on July 8, 2021

**On brief:** *Yeura R. Venters*, Public Defender, and *George M. Schumann*, for appellant.

**On brief:** *Robert J. McClaren*, for appellee Franklin County Children Services.

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch

MENTEL, J.

{¶ 1} Mother, B.R., appeals from the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, granting the motion for permanent custody of her child, B.R., filed by Franklin County Children Services ("FCCS"). For the following reasons, we affirm the trial court's judgment.

**I. Factual and Procedural Background**

{¶ 2} On March 22, 2018, FCCS filed a complaint under R.C. 2151.353 alleging that B.R. was an abused, neglected, and dependent child. The complaint alleged that B.R., then three years old, was in the legal custody of a non-relative, P.C., pursuant to a previous "custody only" case. (Mar. 22, 2018 Compl. at 1.) However, FCCS alleged that it had received reports in July 2017 that "the living conditions were poor with insects and rodents infesting the home, the floors being covered with clothing, trash, animal/insect droppings

and food, and dishes being piled up in the house with flies/gnats," as well as "mice feces around the home." *Id.* B.R. had been taken to the hospital for "a black eye and a knot on her head," as well as "a busted lip" and "old bruising to her right cheek." *Id.* The complaint alleged that P.C. had inflicted B.R.'s injuries and that when P.C. became angry, she withheld food from B.R. *Id.* P.C. claimed that B.R. had hit her head on a table, but caseworkers reported that it was "not possible" for this to be the source of her injury "due to the height of the table." *Id.* During questioning by caseworkers, P.C. "exhibited manic behaviors." *Id.* At the time FCCS filed the complaint, B.R. was in the agency's temporary custody, and the agency requested that P.C.'s legal custody of B.R. be terminated. *Id.* at 2.

{¶ 3} After a hearing held on June 12, 2018, at which the matter was uncontested, the magistrate adjudicated B.R. an abused child under R.C. 2151.031(C), with the remaining counts of the complaint dismissed at the request of FCCS. (June 12, 2018 Mag.'s Decision.) The magistrate approved and adopted the case plan submitted by FCCS, granted the agency temporary custody of B.R. pursuant to R.C. 2151.353(A)(2), and ordered that P.C. have "no visits" with B.R. *Id.* at 2. The trial court adopted the magistrate's decision on June 25, 2018.

{¶ 4} FCCS filed a motion for permanent custody on December 5, 2018, in which the agency stated that it was required to file the motion under R.C. 2151.413(D)(1) because B.R. had been in its temporary custody for more than 12 consecutive months. (Dec. 5, 2018 Mot. at 2, 7.) FCCS argued that clear and convincing evidence supported granting the motion, citing Mother B.R.'s lack of compliance with the case plan and "pending child endangerment charges," B.R.'s abandonment by an unknown father, and B.R.'s "need of legally secure placement, which cannot be achieved without a grant of permanent custody to the agency." *Id.* at 7.

{¶ 5} The trial court held a hearing on the motion for permanent custody on January 13, 2020. Mother B.R. was not present but was represented by an attorney who stated that she did not contest the motion. *Id.* at 10. However, he did request a continuance on her behalf, based on Mother B.R.'s belief that her cousin wanted to seek custody of B.R. (Jan. 13, 2020 Tr. at 6.) FCCS objected to the "last second" request, noting that Mother B.R. had "never mentioned this person before." (Tr. at 7.) The trial court overruled the request and proceeded to hear testimony on the motion. *Id.*

{¶ 6} FCCS first called P.C. as a witness as if on cross-examination. (Tr. at 13.) She testified that B.R. first came to live with her on January 30, 2017 and stayed there until July 7, 2017. (Tr. at 14-15.) P.C. stated that it was a "lie" that she had abused B.R. and that the child had been "kidnapped" and "taken out of the home without permission" when removed. (Tr. at 15.) P.C. asserted that she had complied with all aspects of the case plan created by FCCS. (Tr. at 15-18.) She had not seen B.R. since "October or November of 2017." (Tr. at 18.) When asked if she was seeking custody of B.R., P.C. replied that the child "never should have been taken out of my home." (Tr. at 19.)

{¶ 7} FCCS also called Brittney Gilmore, an FCCS caseworker and licensed social worker, to testify. (Tr. at 28-29.) Ms. Gilmore was the primary caseworker for the case involving B.R. (Tr. at 29.) She testified that B.R.'s case was opened because of "physical abuse" in P.C.'s care as well as the "conditions of [P.C.]'s home." (Tr. at 30.) According to Ms. Gilmore, B.R. was removed from Mother B.R.'s home for "obtaining a burn" before P.C. gained legal custody of B.R. (Tr. at 30-31.)

{¶ 8} Ms. Gilmore's attempts to establish paternity of B.R. were unsuccessful. Testing of an individual, R.W., "determined that he was not the father." (Tr. at 31.) After Mother B.R. reported that J.R., her father was possibly B.R.'s father, Ms. Gilmore made several unsuccessful attempts to engage with him but could not ever get him to take a paternity test or even talk to her about the case. (Tr. at 32.)

{¶ 9} Ms. Gilmore principally worked with Mother B.R. on reunification. (Tr. at 33.) Under the case plan, Mother B.R. was required to attend and participate in parenting classes and the parenting mentor program; demonstrate the ability to "appropriately interact" with B.R.; sign releases for service providers; "be available for all scheduled home visits"; maintain "consistent contact" with FCCS; "complete a psychological assessment and follow through with all recommendations"; comply and follow all court orders; avoid any other criminal charges; not allow any contact between B.R. and R.W.; secure "stable and independent housing that is free of all safety hazards"; and obtain "a stable and legal source of income." (Tr. at 33-34.)

{¶ 10} Ms. Gilmore testified that Mother B.R. completed parenting classes and she had observed her interacting "appropriately" with B.R. (Tr. at 35.) Mother B.R. had also made herself available for scheduled home visits and had completed a psychological

assessment. *Id.* However, Mother B.R. did not attend the counseling that Ms. Gilmore referred her to. (Tr. at 36.) Nor did she maintain independent, stable housing, as she "lived with different relatives" at different times and had also lived with R.W., who was "a registered sex offender" and "was not to have unsupervised contact with any minor children including children of his own." (Tr. at 37.)

{¶ 11} Mother B.R. could not be referred to a parent mentor because obtaining stable, independent housing and achieving "enough progress on the case plan" to be "close to reunification" was a prerequisite to referral. (Tr. at 35.) According to Ms. Gilmore, Mother B.R. did not work and had not had employment during the duration of the case. (Tr. at 37-38.) Ms. Gilmore testified that during her observations of Mother B.R.'s interactions with B.R., the child hugged her and called her mother. Their level of interaction was not one of Ms. Gilmore's areas of concern. (Tr. at 43-44.)

{¶ 12} Ms. Gilmore also described B.R.'s placement history. After leaving P.C.'s home, she was placed with a non-relative for only a "few months" but was removed because J.R., who had sexually abused Mother B.R., was "living in the home" and possibly physically abusing B.R. (Tr. at 44.) Ms. Gilmore moved B.R. to a foster home for 30 days, and then placed in her in another foster home where she stayed for several months. (Tr. at 45.) However, B.R. had to leave that foster home after reports that B.R. was being abused there as well. *Id.* Sometime in 2018, Ms. Gilmore testified, B.R. was moved to her current foster home. (Tr. at 46-47.)

{¶ 13} Based on her bimonthly visits to the foster home, Ms. Gilmore testified that B.R.'s interaction with her current foster mother was "very positive. She appears to be very comfortable with the foster mom," as well as her three biological children. (Tr. at 47-48.) B.R.'s biological sister was placed in the home as well, and B.R. had a "sister bond" with her. (Tr. at 48.) The foster mother was interested in adopting B.R. (Tr. at 49.) Ms. Gilmore recommended granting the motion for permanent custody so that B.R. could be adopted. (Tr. at 50.) When asked about B.R.'s best interests, Ms. Gilmore stated that "issues regarding safety" and Mother B.R.'s non-completion of "portions of the case plan" were concerns, but B.R. was "doing well" in her current foster care environment. (Tr. at 50-51.)

{¶ 14} FCCS also called M.H., B.R.'s current foster mother, as a witness. (Tr. at 62.) She testified that when B.R. first came into her care in June 2018, she was not potty trained

and "didn't know many words." (Tr. at 62-63.) Since then, B.R.'s speech improved and she had speech therapy two days a week at school, where she was enrolled in a HeadStart preschool program. (Tr. at 63.) When B.R. first arrived, M.H. asked her to call her by her first name but later began to refer to her as "mom." *Id.* M.H. stated that she and B.R. played "all the time[]," watched movies together, and "practice our ABCs, our colors; our numbers." *Id.* B.R. and M.H.'s children "play well together," and B.R. and her one-year-old biological sister, who also lived with M.H., also got along. (Tr. at 64.) M.H. stated that she was interested in adopting B.R. and had already filled out preadoption paperwork. (Tr. at 66.)

{¶ 15} Nancy Cody, the court-appointed guardian ad litem for B.R., also testified. Ms. Cody had performed "regular home visits" at all of B.R.'s placements since being removed from P.C.'s home. (Tr. at 69.) Ms. Cody attended her HeadStart enrollment, reviewed her medical and FCCS records, and attended supervised visits. *Id.*

{¶ 16} Ms. Cody spoke with B.R., who was five at the time, about her wishes. (Tr. at 71.) She showed B.R. a picture of a house and asked her: "if this were your home, who would you like to have live with you?" (Tr. at 71.) B.R. told Ms. Cody "that she was happy with her brothers and sisters in the home," referring to M.H.'s children, and that "she wanted mommy to be with her." *Id.* When Ms. Cody asked who mommy was, B.R. pointed to M.H. *Id.*

{¶ 17} Ms. Cody's recommendation was that B.R. "remain with [M.H.] hopefully with an opportunity for adoption." *Id.* Ms. Cody's "main concern" was "how many times [B.R.] had to be moved" but noted "how much better her current placement has gone in the two years that she's been there." (Tr. at 71-72.) She described B.R. as "flourishing" in M.H.'s home: "She's getting the speech therapy and educational support that she needs." (Tr. at 72.) Although Ms. Cody believed that B.R. had "some delays in terms of her academic performance," she felt that B.R. was "getting better" where she was. *Id.* In addition, Ms. Cody opined that "it would be harmful for her to be moved again," and "very harmful if she [were] moved to a different school." *Id.* Ms. Cody stated that B.R.'s best interests "would be served by her achieving permanency" in M.H.'s home, where she was "happy," she was "learning," "her three older siblings [were] like role models to her," and she had the possibility of living with her biological sister. (Tr. at 77-78.)

{¶ 18} Ms. Cody also described Mother B.R. as "a very nice person, [a] very sweet person" but "extremely immature." (Tr. at 77.) When observing Mother B.R.'s interactions with B.R., Ms. Cody said that Mother B.R. "didn't change her or feed her; it was just -- just playing with her." *Id.* Ms. Cody expressed concern about reunification because Mother B.R. had "never held a job" or a permanent residence and was pregnant again at the time of trial. *Id.*

{¶ 19} FCCS called no more witnesses but submitted as an exhibit a judgment entry from Mother B.R.'s criminal case in which she had entered a plea of guilty to one count of child endangerment, in violation of R.C. 2919.22. (Tr. at 91; FCCS Ex. 1.)

{¶ 20} The trial court granted the motion for permanent custody, terminated P.C.'s legal custody of B.R., and divested Mother B.R. of her parental rights. (Jan. 23, 2020 Decision and Jgmt. Entry at 19-20.)

{¶ 21} Mother B.R. filed a timely appeal and asserts the following assignment of error:

> The juvenile court's judgment finding that permanent court commitment of the minor child to Franklin County Children Services is in the minor child's best interests under R.C. 2151.414(B)(1), R.C. 2151.414(B)(1)(d), and R.C. 2151.414(D)(1) is against the manifest weight of the evidence.

## II. Standard of Review

{¶ 22} "A trial court's determination in a permanent custody case will not be reversed on appeal unless it is against the manifest weight of the evidence." *In re K.L.*, 10th Dist. No. 13AP-218, 2013-Ohio-3499, ¶ 13, citing *In re Andy-Jones*, 10th Dist. No. 03AP-1167, 2004-Ohio-3312. Under the manifest weight of the evidence standard, the court of appeals "will not overturn a permanent custody order when it is supported by competent, credible evidence." (Citations omitted.) *In re C.W.*, 10th Dist. No. 19AP-309, 2020-Ohio-1248, ¶ 51. The reviewing court "must make every reasonable presumption in favor of the judgment and the trial court's findings of facts." *In re K.M.*, 10th Dist. No. 15AP-64, 2015-Ohio-4682, ¶ 13.

## III. Analysis

{¶ 23} R.C. 2151.414 governs the determination of an agency's motion for permanent custody of a child. "Before granting permanent custody, a trial court must make

two determinations by clear and convincing evidence."  *In re C.W.* at ¶ 54, citing *In re R.G.*, 10th Dist. No. 12AP-748, 2013-Ohio-914, ¶ 6.  First, the trial court must determine whether one of the five factors under R.C. 2151.414(B)(1) applies.  *Id.*

{¶ 24}  Here, the trial court concluded that "clear and convincing evidence" satisfied two of the R.C. 2151.414(B)(1) factors.  (Jan. 23, 2020 Decision and Jgmt. Entry at 11.)  Under R.C. 2151.414(B)(1)(b), the agency must prove that the child has been abandoned.  The trial court ruled that this factor applied to B.R.'s unknown father, who had "failed to visit with her for a period of time in excess of 90 days and therefore has legally abandoned her."  (Decision and Jgmt. Entry at 11.)

{¶ 25}  The second factor was R.C. 2151.414(B)(1)(d), which applies if "[t]he child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period."  The trial court found clear and convincing evidence that "[B.R.] was placed into the temporary custody of FCCS in July 2017.  She has remained in the temporary custody of FCCS since that time and has therefore been in [temporary] custody for twelve or more months of a consecutive twenty-two month period."  (Decision and Jgmt. Entry at 11.)  Contrary to her assertion in the assignment of error that this finding was against the manifest weight of the evidence, Mother B.R. concedes in her briefing that R.C. 2151.414(B)(1) was satisfied.  (Appellant's Brief at 17, stating that, because "B.R. was in FCCS's custody for greater than 12 months out of a 22-month period under R.C. 2151.414(B)(1)(d), [] it is unnecessary to assess the propriety of the trial court's findings under the other R.C. 2151.414(B)(1) triggering events.")

{¶ 26} Rather, Mother B.R. contests the second part of the trial court's R.C. 2151.414(B)(1) analysis, which requires that the trial court determine "by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody."  This determination requires consideration of any of the following "relevant factors" under R.C. 2151.414(D)(1):

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 27} Mother B.R. "contends that there is evidence in the record showing that she loves her daughter" and that she "maintained visitation," during which she appropriately interacted with B.R. and "was a mother-figure" to her. (Appellant's Brief at 18-19.) She also claims that that B.R. "knows" that Mother B.R. "is her biological mother." *Id.* Although she cites no portion of the record to support these assertions, we acknowledge that Ms. Gilbert testified that Mother B.R. acted appropriately during visitations, that B.R. hugged her and called her mom, and that Ms. Gilbert did not consider their interaction an "area of concern." (Tr. at 43-44.) On the other hand, the guardian ad litem observed that Mother B.R. "didn't change her or feed her; it was just -- just playing with her." (Tr. at 77.) We also acknowledge that when considering the "interaction and interrelationship of the child" with others under R.C. 2151.414(D)(1)(a), the trial court stated that B.R. "demonstrates a continuing bond with her mother." (Decision and Jgmt. Entry at 17.) Mother B.R. argues that "this is not a case where a mother is alleged to have put drug addiction or alcoholism ahead of her daughter's interests." (Appellant's Brief at 19.) Although there is evidence of a bond between Mother B.R. and her daughter, the fact remains that the trial court determined that B.R. is "extremely bonded to her foster mother, her foster siblings and her half-sister," and ample testimony supported this conclusion. (Decision and Jgmt. Entry at 17.) Thus, we cannot conclude that the trial court's consideration of R.C. 2151.414(D)(1)(a) was against the manifest weight of the evidence.

{¶ 28} The second best interest factor is "[t]he wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child." R.C. 2151.414(D)(1)(b). The trial court noted that B.R. "is only 5 years old. To the extent she is able to do so she has expressed her wish to remain in her foster home." (Jan. 23, 2020 Decision and Jgmt. Entry at 18.) Mother B.R. has cited no evidence contradicting the trial court's finding on this factor. Our review of the record confirms that Ms. Cody, the guardian ad litem, reported that B.R. expressed a desire to live with her foster mother, who she identified as "mommy." (Tr. at 71.)

{¶ 29} The trial court also emphasized "the custodial history of the child" under R.C. 2151.414(D)(1)(c), stating that B.R. "has had numerous placements and caretakers in her young life. [She] has thrived in her current placement where she has lived for a significant period of time." (Jan. 23, 2020 Decision and Jgmt. Entry at 18.) The manifest weight of the evidence supports this assertion. Ms. Gilbert described the numerous placements and abuse that B.R. suffered before being finally placed with M.H. (Tr. at 44-47.)

{¶ 30} The trial court also addressed "[t]he child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency." R.C. 2151.414(D)(1)(d). It stated that B.R. is:

> [D]esperately in need of a legally secure permanent placement. The evidence is clear that neither of her parents or relatives have given [an] indication that they can provide this for her now or in the future. Although [P.C.] has indicated a desire to provide her a secure permanent placement the evidence does not support her request. Further, by her own volition she did not foster any type of continuing relationship with [B.R.] after she was moved. Under such circumstances an attempted permanent placement with [P.C.] would place [B.R.] at risk for additional removals. Therefore, the Court finds that a legally secure permanent placement cannot be accomplished without a grant of the agency's motion and allowing [B.R.] [to be] placed for adoption.

(Jan. 23, 2020 Decision and Jgmt. Entry at 18.)

{¶ 31} Mother B.R. argues that "this is not a case where a mother is homeless and thus entirely unable to have her child with her," or one in which the mother "has no means of any kind of ensuring that her child's needs are met." (Appellant's Brief at 19.) This may be, but Mother B.R. cites no evidence in the record that demonstrates she has any means

to support her daughter or to meet her material needs. The guardian ad litem testified that Mother B.R. had "never held a job" or a permanent residence, and Ms. Gilbert testified that Mother B.R. had lived with a registered sex offender who was not allowed near children. (Tr. at 37, 77.) There is no evidence that Mother B.R. had the ability to provide B.R. with legally secure placement.

{¶ 32} R.C. 2151.414(D)(1)(e) asks "[w]hether any of the factors in divisions (E)(7) to (11) * * * apply in relation to the parents and child." The trial court found that R.C. 2151.414(E)(7)(c) applied because Mother B.R. "pled guilty to endangering a child." (Jan. 23, 2020 Decision and Jgmt. Entry at 18.) This factor was properly considered by the trial court, as evidence of the offense was admitted without objection. (Tr. at 91; FCCS Ex. 1.)

{¶ 33} Finally, the trial court appropriately considered the guardian ad litem's recommendation that it grant the motion to be a "relevant factor" under R.C. 2151.414(D)(1). *See In re A.S.*, 10th Dist. No. 20AP-93, 2021-Ohio-218, ¶ 28 (holding that the trial court "thoroughly reviewed and weighed the evidence in relation to all factors" in part where "guardian ad litem's recommendation that FCCS be granted permanent custody [was] an additional relevant factor under R.C. 2151.414(D)(1)").

{¶ 34} Mother B.R.'s only other arguments describe her partial compliance with the case plan but do not otherwise demonstrate or even address the trial court's analysis of the evidence in relation to the best interest factors under R.C. 2151.414(D)(1). She emphasizes that she "maintained weekly telephone contact with B.R. and/or the foster mother," she "cooperated" with visitation requirements and the need for a psychological assessment, "had regular contact with the caseworker," and "completed the parenting classes requirement in the case plan." (Appellant's Brief at 19.) "Although compliance with a case plan may be relevant to the trial court's best interest determination, it is not dispositive." *In re T.S.*, 10th Dist. No. 07AP-624, 2007-Ohio-6645, ¶ 10. While Mother B.R. accomplished some of the required objectives, she did not comply with the case plan in the areas that would have demonstrated an ability to provide legally secure placement, such as employment and housing. *See In re J.Z.*, 10th Dist. No. 05AP-8, 2005-Ohio-3285, ¶ 20 (affirming grant of permanent custody motion where "the evidence showed that appellant

failed to successfully complete any of the significant elements of her case plan, despite some progress in a few areas").

{¶ 35} Mother B.R. has not demonstrated that the manifest weight of the evidence did not support the trial court's application of the best interest factors under R.C. 2151.414(D)(1). Accordingly, we find no error in the trial court's decision to grant the motion for permanent custody. We overrule the assignment of error and affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.

*Judgment affirmed.*

SADLER and BEATTY BLUNT, JJ., concur.

_____