[Cite as *In re V.W.*, 2022-Ohio-2487.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

In re: [V.W.],                                          :

                                                       :          No. 21AP-437
                                                                (C.P.C. No. 19JU-4802)

[R.W. Father,                                          :

             Appellant].                               :          (REGULAR CALENDAR)

In re: [V.W.],                                         :

                                                       :          No. 21AP-438
                                                                (C.P.C. No. 19JU-4802)

[B.R. Mother,                                          :

             Appellant].                               :          (REGULAR CALENDAR)

D E C I S I O N

Rendered on July 19, 2022

**On brief:** *William T. Cramer*, for appellant, R.W.

**On brief:** *April F. Campbell*, for appellant, B.R.

**On brief:** *Robert J. McClaren*, for appellee, Franklin County
Children Services.

APPEALS from the Franklin County Court of Common Pleas,
Division of Domestic Relations and Juvenile Branch

SADLER, J.

{¶ 1} Appellant, R.W., biological father of V.W., a minor child, and appellant B.R., biological mother of V.W., appeal the August 23, 2021 judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations and Juvenile Branch, which granted permanent custody of V.W. to appellee, Franklin County Children Services ("FCCS"). For the following reasons, we affirm that judgment.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} Appellants are the biological, unmarried parents of V.W. (born January 2019). On April 19, 2019, when V.W. was three months old, FCCS filed a complaint alleging that V.W. was a neglected child pursuant to R.C. 2151.03(A)(2) and a dependent child pursuant to R.C. 2151.04(C), (D)(1), and (D)(2). To support these causes of action, the complaint alleged two of V.W.'s siblings had previously been removed from B.R.'s custody. One sibling was in the temporary custody of FCCS, with a pending motion for permanent custody after being found to be an abused child due to conditions of a legal custodian's home and physical abuse. Another sibling of V.W. was in the legal custody of a relative after that child was found to be a dependent minor due to B.R.'s incarceration for endangering children. Specific to the incident causing V.W.'s removal from the home, the complaint alleged B.R. left V.W. in the care of R.W., who is a sex offender and not legally permitted to be left alone with children. The complaint states that, in addition to his conviction for unlawful contact with a minor, R.W. had a criminal history that included failure to file notice of change of address and aggravated involuntary manslaughter. The complaint further alleged that a loaded gun was found in the home and the conditions of the home were unacceptable for an infant.

{¶ 3} V.W. was removed from the home under an emergency care order and placed with a relative. R.W. was arrested and incarcerated due to a parole violation. A few days later, on April 22, 2019, a juvenile court magistrate granted a temporary order of custody to FCCS. A guardian ad litem ("GAL") was appointed for V.W., and FCCS prepared and filed case plans with the goal of reunifying V.W. with appellants. After the relative caring for V.W. advised FCCS that she was no longer able to keep V.W., at the end of May 2019, FCCS placed V.W. in the same certified foster home as her older sibling, B.R.R. On June 24, 2019, following a hearing, the juvenile court found V.W. to be neglected and dependent, granted FCCS temporary court custody pursuant to R.C. 2151.353(A)(2), and approved and adopted the case plan.

{¶ 4} On March 11, 2020, FCCS filed a motion for permanent custody of V.W. for purposes of adoption. A month later, B.R. gave birth to A.R.; A.R. was placed in the custody of a relative, S.P. S.P. moved the court to be added as a party in order to pursue custody of V.W. and filed a motion for legal custody.

**{¶ 5}** In June 2020, following a hearing on FCCS's motion for permanent custody, the juvenile court extended the temporary court commitment and the case plan. In doing so, the trial court found that reasonable efforts had been made by FCCS to prevent or eliminate the need for removal of V.W. from the home, and that placement and casework services were provided by FCCS to the family of the child, but the removal of V.W from home continued to be necessary because the circumstances giving rise to the original filing had not been sufficiently alleviated. The trial court further ordered R.W. to have no contact with V.W.

**{¶ 6}** R.W. was released from prison on August 25, 2020. He was placed on parole supervision with conditions that included a prohibition against unsupervised contact with minors.

**{¶ 7}** B.R. had twins in March 2021. The twins were also removed from B.R.'s care and placed in the foster home with V.W. and B.R.R. In June 2021, an amended case plan was approved adding information pertaining to the twins and allowing R.W. to have supervised visitation with V.W. as permitted by his parole officer.

**{¶ 8}** A dispositional hearing on FCCS's motion for permanent custody occurred on August 2 and 16, 2021. Appellants both attended the hearing and were represented by counsel. Appellants testified as well as the FCCS caseworker (Brittany Gilmore), the GAL for V.W., an Adult Parole Authority specialist (Ruth Peters-Freeman), the parole officer for R.W (Patrick Sylvester), and a family coach familiar with R.W.

**{¶ 9}** B.R testified that she has six children, all of whom reside out of her custody: N.R. (in the custody of a relative); A.R. (in the custody of S.P.); B.R.R. (in the permanent custody of FCCS and placed in a foster home)[1]; V.W. (in the temporary custody of FCCS and placed in a foster home); and twins (both initialed Y.R.) (in the temporary custody of FCCS and placed in a foster home). B.R. admitted she plead guilty to and was convicted of child endangering regarding B.R.R.

**{¶ 10}** According to B.R., she had been working with a caseworker, Ms. Gilmore, who discussed the case plan elements with her. B.R. characterized the case plan as including completing "parenting class[es], counseling, drug tests, work, Netcare." (Aug. 2., 2021 Tr. at 19.) B.R. testified that her caseworker provided her a referral list for parenting

---

[1] *See In re B.R.*, 10th Dist. No. 20AP-117, 2021-Ohio-2324.

classes, referrals for two psychological evaluations, and transportation assistance including bus passes and tickets to Columbus. According to B.R., she completed the parenting classes, one of the two psychological evaluations referred to her, a drug and alcohol assessment, and one (negative) urine screen. B.R. stated she was waiting on a call to schedule the second psychological evaluation. B.R. testified that she attended weekly visitations with V.W.

{¶ 11} Regarding housing, B.R testified that when she was pregnant with V.W. she was "in and out of [a] shelter" and, once she gave birth to V.W., she lived with R.W. until V.W. was removed from the home. (Aug. 2, 2021 Tr. at 12.) Since the removal of V.W., she had lived with a friend, her aunt, and at a shelter again. At the time of the hearing, B.R. reported she was currently staying at a shelter, where she had resided for approximately a month. B.R.'s plan was to get a house and live alone with V.W. without R.W. involved. She testified she did not have anyone to support her in taking care of V.W. According to B.R., she was on a waiting list for a house since the landlord required her to be employed for 90 days prior to getting the house.

{¶ 12} As to employment, B.R. testified that she had been employed by Waffle House since May 17, 2021. Prior to Waffle House, she worked at another business for about two months, since March 2021, and had not held another job before that point. B.R. believed she could get insurance through her job but had not signed up yet; she probably would be able to enroll in a few days after the hearing. B.R. reported having a car as transportation.

{¶ 13} R.W. also contested FCCS's permanent custody motion and testified at the August 2021 hearing. R.W. testified that he pleaded guilty to unlawful conduct with a minor and failure to register address in February 2012, and testified the victim was not a minor that lived in his home. He agreed he is under a requirement to register as a sex offender for 25 years. R.W. additionally admitted he entered a no contest plea to aggravated riot and involuntary manslaughter in April 2015. After R.W. got out of prison, he admitted he lived with B.R. and V.W. in early 2019.

{¶ 14} R.W. testified it was not his fault that V.W. was removed from his home in April 2019; he believed he "was supposed to be allowed" to be unsupervised with minors since he completed a sex offender class, and he was unsure why his parole officer said

otherwise and V.W. was removed. (Aug. 2, 2021 Tr. at 30.) R.W. testified he was arrested the day V.W. was removed, and that the gun found in his home (not his contact with V.W.) violated the terms of his parole. Despite challenging the reason V.W. was removed and the basis for his parole violation, R.W. agreed that, at the time of the August 2021 permanent custody hearing, he was subject to a condition of parole prohibiting unsupervised contact with minors.

{¶ 15} R.W. testified that Ms. Gilmore talked with him about a case plan and agreed the case plan included completing a sexual offender assessment, a domestic violence assessment, and parenting classes, which R.W. testified he completed. According to R.W., he completed the case plan on his own. He obtained secure housing in Youngstown, Ohio (a two-bedroom, furnished apartment) and is employed as a traveling welder making $22.75 an hour. He works 14 to 16 hours a day, six days a week. R.W. testified that he is also going to college, and in a year would have a degree in business entrepreneurship with the goal of eventually owning and renting real estate and possibly a nightclub. R.W. plans, if he is awarded custody, to enroll V.W. in a specific preschool and to seek help from his siblings and relatives in Youngstown, who he said are "already talking about helping [him]." (Aug. 2, 2021 Tr. at 43.)

{¶ 16} According to R.W., the parole authority would work with him to amend his sentence to allow unsupervised contact with V.W. He agreed he needed the judge or parole board to change the current terms of his parole in order to regain custody of V.W. R.W. believed that, although he is on parole supervision until August 2023, he could get off early—possibly August 2022—for good behavior.

{¶ 17} R.W. began supervised visitations in February 2021 and visited with her a total of six times for one hour each visit. According to R.W., he believes he is also the father of the twins born to B.R. in March 2021. R.W. agreed that he does not have any children in his custody.

{¶ 18} Ms. Gilmore, the FCCS caseworker, testified to initially being assigned to this case in 2017 through her involvement with V.W.'s older sibling, B.R.R. FCCS opened a case specific to V.W. after B.R. disclosed that she had left V.W. alone with R.W. After V.W. was removed from the home, FCCS placed V.W. with a maternal cousin. That placement lasted about a month, until the relative no longer wished to care for V.W. According to

Ms. Gilmore, she submitted the case for additional kinship placements to be evaluated. Although some relatives were located and talked to, none of those relatives lead to a placement. As a result, V.W. was placed in the same foster home as B.R.R. on May 30, 2019.

{¶ 19} Ms. Gilmore testified that a case plan was adopted for B.R., which required B.R. to complete services for parenting, working with a parent mentor, obtain an updated psychological assessment and follow through with all of the recommendations, obtain stable housing and income sufficient to meet the needs of V.W., complete an alcohol and drug assessment and complete random screens, not allow V.W. to have unsupervised time with R.W., and follow through with all court orders.

{¶ 20} Ms. Gilmore provided referral sheets for the parenting classes, two psychological assessments, and linked her to a community service worker to assist with housing and income issues. The referral for the parent mentor requirement could not be completed, according to Ms. Gilmore, because the referral must be made when the child is close to returning home, which is not the case with V.W. since B.R. had not obtained stable housing or completed an updated psychological assessment.

{¶ 21} Ms. Gilmore testified that B.R. completed the parenting classes, signed releases of information for all service providers, completed a drug and alcohol assessment and one screen in July 2021, and obtained employment at Waffle House. B.R. was available for home visits with Ms. Gilmore "sporadically" since B.R. did not have housing of her own. (Aug. 2, 2021 Tr. at 59.) Ms. Gilmore testified that B.R had never had her own housing since V.W. was born. Ms. Gilmore testified that she did not supply B.R. with referrals for housing specific to Mahoning County since B.R. told her she was already on a waiting list, which B.R. had been asserting for a "span of time" and not just recently and did not otherwise request help in that regard. (Aug. 2, 2021 Tr. at 124.) According to Ms. Gilmore, B.R. completed a psychological assessment before V.W. was born, but did not complete a new assessment after V.W. was born even though Ms. Gilmore made two referrals to assist in this effort. Ms. Gilmore noted the agency required B.R. to have an updated psychological assessment because the information B.R. provided in the first assessment did not match information B.R. provided to FCCS. In Ms. Gilmore's view, B.R. did not substantially

complete the case plan since she had not obtained stable housing, completed the updated psychological assessment, or worked with a parent mentor.

{¶ 22} Ms. Gilmore also described B.R.'s visits with V.W. as "sporadic": although B.R. had been set up to have weekly visits, she only attended the scheduled visits about once a month. (Aug. 2, 2021 Tr. at 70.) During the visits, B.R. engaged with V.W., tended to her needs, and played with her. In Ms. Gilmore's view, V.W. did have a bond with B.R. Despite a bond between the two, Ms. Gilmore testified she would not recommend V.W. be placed with B.R. due to B.R.'s housing situation, lack of completion of an updated psychological assessment, and her relationship with R.W. According to Ms. Gilmore, B.R. disclosed she had lived with R.W. as recently as April 2021.

{¶ 23} Regarding R.W., Ms. Gilmore testified that she spoke with him about his case plan. She discussed the plan with him on the phone while he was incarcerated and met with him to discuss the plan when he was released from prison in August 2020. According to Ms. Gilmore, the case plan for R.W. required him to: follow rules of the court, parole, probation, and community; not have unsupervised time with V.W. or any minors; not place V.W. in any harmful situation; not have firearms; complete a sex offender and domestic violence assessment; follow through with all recommendations of the assessment; take parenting classes; sign releases of information; have safe, stable, and clean housing; maintain a legal and stable source of income; and obtain permission from parole authority for every visit with the children. Ms. Gilmore provided R.W. with information for a referral for a domestic violence assessment in Youngstown and referral information for other services in Franklin County, since he had told her that he was obtaining housing in Franklin County.

{¶ 24} Ms. Gilmore confirmed R.W. completed the sex offender assessment and followed through with those recommendations, completed parenting classes, secured acceptable housing and employment, and obtained permission from the parole authority to visit with V.W. A family coach with Alta Behavioral Healthcare called by R.W. confirmed that R.W. was an active participant in a parenting group for preschool age children, completed that program successfully, and is voluntarily attending another parenting program. Ms. Gilmore testified that R.W. had visited V.W. approximately six times

consisting of once-a-month visits for an hour. Ms. Gilmore witnessed two of those visits, and reported that R.W. interacted appropriately with V.W.

{¶ 25} Despite R.W.'s completion of his case plan, Ms. Gilmore testified that she would not recommend him for placement because, "[h]e is a registered sex offender [who has] been charged with Unlawful Contact with a Minor[;] * * * [the] terms of his parole, he's not to have unsupervised contact with any minor children, including his own, and would be at risk of returning back to prison"; his past history of violence; and reports of threats of violence. (Aug. 2, 2021 Tr. at 78.) She testified that R.W. had only shown it was "theoretically possible" for him to address barriers to him having unsupervised contact with a minor child. (Aug. 2, 2021 Tr. at 93.) Ms. Gilmore further testified that S.P. and B.R. disclosed that R.W. had made threats of violence toward them, and she noted that the violence assessment completed by R.W. was based on self-reported information. Ms. Gilmore agreed completion of the case plan is only one consideration as to whether FCCS would pursue reunification with a parent.

{¶ 26} Ms. Gilmore testified that she had visited the foster home where V.W. is placed twice a month since the placement. According to Ms. Gilmore, V.W. is doing well in foster care, which includes living with three of her siblings, calls the foster care provider "mom," and is bonded to her. Ms. Gilmore reported that the foster home is a possible adoptive home. (Aug. 2, 2021 Tr. at 73.) According to Ms. Gilmore, she has continued to investigate relatives for possible placement, including, most recently, S.P., who ultimately declined a home study to support placement, thereby closing that referral. Ms. Gilmore did not personally investigate possible placements with R.W.'s relatives and could not recall if R.W. ever told her about a possible placement with his relatives. According to Ms. Gilmore, the kinship department typically handles those investigations, and she did not know whether that department investigated his family. According to Ms. Gilmore, V.W. did not have a relationship with the two siblings that were not placed with her in the foster home.

{¶ 27} Next, a CASA Volunteer testified to being the court appointed special advocate (GAL) for V.W. beginning in April 2019, and previously being assigned as the special advocate for B.R.R. in 2017. According to the GAL, she had not observed B.R. or R.W.'s visitations with V.W. but did not believe there was any issues regarding either parent's interactions with V.W.

**{¶ 28}** The GAL visited the foster home, and testified that the foster mom is divorced, a special education teacher, and a foster parent. According to the GAL, V.W. and her foster mom are "quite bonded" and V.W. is very happy and comfortable with her. (Aug. 16, 2021 Tr. at 35.) The foster mom is a "gentle disciplinarian" who does not raise her voice and is able to maintain a happy home environment. (Aug. 16, 2021 Tr. at 38.)

**{¶ 29}** The GAL observed that V.W. and B.R.R. are "very close" and B.R.R. is very fond of V.W. and are "often hugging and doing things together." (Aug. 16, 2021 Tr. at 35.) V.W. was initially "a little jealous" of her younger twin siblings, but that reaction has lessened over time. (Aug. 16, 2021 Tr. at 36.) The foster mom has three biological children—one in middle school and two in high school—and the GAL thought all the children seemed very compatible and polite with one another, were "a very loving group," and remarked that the older children take V.W. places and play with her. (Aug. 16, 2021 Tr. at 37.) The GAL testified that V.W. is "not verbally" capable of expressing her wishes, but that she is "very, very happy in [her foster] household." (Aug. 16, 2021 Tr. at 38.)

**{¶ 30}** In the GAL's opinion, FCCS should be granted permanent custody of V.W. with the objective of facilitating her adoption with the foster mom. Her view was based both on V.W. being in a safe, nurturing environment where she is doing well, her need for permanency, and the inability of both biological parents to provide a comfortable, safe, and happy environment. The GAL noted B.R. is 25-years-old with six children, none of whom are in her custody, and is not in a position to create a home environment for V.W. In the GAL's view, R.W. had not changed his ways, has been belligerent and domineering, and "believes that rules do not apply to him and that he should have his way[.]" (Aug. 16, 2021 Tr. at 42.)

**{¶ 31}** Ruth Peters-Freeman, a sex offender specialist for the Akron region of the Adult Parole Authority, testified R.W. is currently on post-release control for a previous sex offense conviction and that supervision expires October 6, 2023. Ms. Peters-Freeman unequivocally stated R.W. is not eligible for a reduction in supervision. According to Ms. Peters-Freeman, as a condition of his parole, R.W.is prohibited from having unsupervised contact with minors, which includes a strict prohibition of residing or having overnight contact with a minor and having other forms of contact reviewed by the parole officer and subject to her approval. Ms. Peters-Freeman testified no requests had been

made to expand R.W.'s contact with V.W., and outlined a multiple-step, "complicated" process to change parole restrictions. (Aug. 16, 2021 Tr. at 13.)

{¶ 32} Patrick Sylvester, a State of Ohio parole officer, testified that he has supervised R.W. for a couple of years. Mr. Sylvester testified that R.W. had been compliant as to this current period of supervision (not in reference to his previous parole violations that led to incarceration). In Mr. Sylvester's view, R.W. doesn't have an early release date, but instead has a "maximum release date" of around early 2023, and believed it was "possible" his release date could be moved up due to his compliance, but he would "have to actually check on that again" to make sure. (Aug. 16, 2021 Tr. at 25.) Mr. Sylvester testified that the parole authority would follow orders of the court.

{¶ 33} S.P. did not appear at the hearing and no party moved to continue the hearing to investigate any other relative. At the end of the hearing, the trial court judge dismissed, without objection, S.P.'s motion for legal custody for failure to prosecute.

{¶ 34} On August 23, 2021, the juvenile court issued a judgment granting FCCS permanent custody of V.W. for the purposes of adoption. Specifically, the juvenile court found: FCCS made reasonable efforts to prevent or eliminate the need for removal of V.W. from her home and to return her to B.R. and/or R.W.; FCCS presented clear and convincing evidence that "[a]t least one (1) of the sections listed under R.C. 2151.414(B)(1) applies"; R.W. abandoned V.W. as a result of his incarceration; V.W. was in the custody of FCCS for 12 or more months out of a consecutive 22 month period; V.W. cannot be placed with her mother or father within a reasonable time since FCCS presented clear and convincing evidence as to the existence of factors stated in R.C. 2151.414(E)(1), (E)(7)(c), and (E)(16) as to B.R. and factors R.C. 2151.414(E)(1), (E)(10), and (E)(12) as to R.W.; no relative or other interested person has been identified and approved as an appropriate placement for legal custody; and granting FCCS' motion for permanent custody is in the child's best interest considering the factors in R.C. 2151.414(D). (Aug. 23, 2021 Decision & Entry at 20-21.)

{¶ 35} R.W. and B.R. filed timely appeals. Those appeals were consolidated for review.

## II. ASSIGNMENTS OF ERROR

{¶ 36} R.W. submits four assignments of error:

1. The juvenile court's judgment erroneously relied in part on R.C. 2151.414(B)(2) to award permanent custody.

2. The trial court's finding that the agency made reasonable efforts toward reunification is not supported by clear and convincing evidence.

3. Trial court abused its discretion in dismissing the possibility of placement with father's relatives.

4. [R.W.]'s due process rights were violated by a grant of permanent custody that was not supported by the weight of the evidence.

B.R. submits four assignments of error:

1. The trial court's decision to grant permanent custody of V.W. to [FCCS] should be reversed, because the record does not support the trial court's finding that V.W. could not be placed with her mother within a reasonable time.

2. The trial court's decision to grant permanent custody of V.W. to [FCCS] should be reversed, because it was not in V.W.'s best interest to do so.

3. The trial court's decision should be reversed because the finding that the agency made reasonable efforts toward reunification in [B.R.]'s case was not supported by clear and convincing evidence.

4. The trial court's decision should be reversed because the evidence weighed manifestly against granting permanent custody of V.W. to [FCCS].

## III. STANDARD OF REVIEW

{¶ 37} A parent has a "fundamental liberty interest * * * in the care, custody, and management of [his or her child]." *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). The Supreme Court of Ohio has noted that "[p]ermanent termination of parental rights has been described as 'the family law equivalent of the death penalty in a criminal case.' * * * [and] parents 'must be afforded every procedural and substantive protection the law allows.' " *In re Hayes*, 79 Ohio St.3d 46, 48 (1997), quoting *In re Smith*, 77 Ohio App.3d 1, 16 (1991).

{¶ 38} "However, [parental] rights are not absolute." *In re A.S.*, 10th Dist. No. 20AP-93, 2021-Ohio-218, ¶ 19. "[I]t is plain that the natural rights of a parent * * * are always subject to the ultimate welfare of the child, which is the polestar or controlling principal to be observed." *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979) (internal

quotation omitted).  "Parental interests must be subordinated to the child's interest in determining an appropriate disposition of any petition to terminate parental rights." *Id.*

{¶ 39} "A trial court's determination in a permanent custody case will not be reversed on appeal unless it is against the manifest weight of the evidence." *In re K.L.*, 10th Dist. No. 13AP-218, 2013-Ohio-3499, ¶ 13.  "Judgments supported by some competent, credible evidence as to each of the essential elements of the case are not against the manifest weight of the evidence." *Id.*  " 'Where clear and convincing proof is required at trial, a reviewing court will examine the record to determine whether the trier of fact had sufficient evidence before it to satisfy the requisite degree of proof.' " *In re B.R.*, 10th Dist. No. 18AP-903, 2019-Ohio-2178, ¶ 37, quoting *In re J.F.*, 8th Dist. No. 105504, 2018-Ohio-96, ¶ 47. "Clear and convincing evidence is that degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the facts to be established." *In re K.L.* at ¶ 14, citing *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.  "It is more than a mere preponderance of the evidence but does not require proof beyond a reasonable doubt."  "In conducting our review, every reasonable presumption must be made in favor of the trial court's findings of fact and judgment." *In re L.W.*, 10th Dist. No. 17AP-586, 2018-Ohio-2099, ¶ 8.

{¶ 40} Purely legal questions are reviewed de novo on appeal. *Zimmer v. Zimmer*, 10th Dist. No. 00AP-383, 2001 Ohio App. LEXIS 713 (Feb. 27, 2001); *see, e.g., In re N.M.P.*, 160 Ohio St.3d 472, 2020-Ohio-1458, ¶ 1, 13-29 (determining the meaning of the "12 months of a consecutive 22 month period" requirement stated in R.C. 2151.414(B)(1)(d)).

## IV. ANALYSIS

{¶ 41} The appellants' eight assignments of error collectively challenge the trial court's decision to grant permanent custody of V.W. to FCCS for purposes of adoption.  For clarity of analysis and to avoid duplication, we address the appellants' assignments of error in five categories: (1) reasonable efforts at reunification; (2) reliance on R.C. 2151.141(B)(2); (3) placement with B.R. within a reasonable time; (4) best interests of V.W.; and (5) placement with R.W.'s relative.

### (1) Reasonable efforts at reunification (R.W.'s second assignment of error, B.R.'s third assignment of error)

{¶ 42} Both appellants argue the trial court erred in concluding FCCS made reasonable efforts to reunify the family as required by R.C. 2151.419.  R.C. 2151.419(A)(1)

provides that, at certain hearings, the trial court is obligated to determine whether the children's services agency met its burden of proving it made "reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home" or whether certain exceptions listed in R.C. 2151.419(A)(2) apply. The exceptions listed in R.C. 2151.419(A)(2) include situations where a parent abandons a child, a parent has had parental rights involuntarily terminated with respect to a sibling of the child, or a parent was convicted of or pleaded guilty to certain offenses, including R.C. 2919.22(B)(2). *See* R.C. 2151.419(A)(2)(a)(iii), (A)(2)(d), (A)(2)(e). A children's services agency may not file for permanent custody "[i]f reasonable efforts to return the child to the child's home are required under [R.C. 2151.419, and] the agency has not provided the services required by the case plan to the parents of the child or the child to ensure the safe return of the child to the child's home." R.C. 2151.413(D)(3)(b).

{¶ 43} By its plain terms, "R.C. 2151.419(A)(1) does not apply in a hearing on a motion for permanent custody filed pursuant to R.C. 2151.413." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 43. However, if the agency is not relieved of its burden to prove reasonable efforts under R.C. 2151.419 through an exception, and it "has not established that reasonable efforts have been made prior to the hearing on a motion for permanent custody, then it must demonstrate such efforts at that time." *Id*. *In re K.D.*, 10th Dist. No. 18AP-746, 2019-Ohio-1077, ¶ 50.

{¶ 44} Here, the trial court found as a part of its permanent custody determination that FCCS had made reasonable efforts to prevent or eliminate the need for removal of V.W. from the home. Both R.W. and B.R. argue that the trial court's reasonable efforts finding is not supported by the record. R.W. argues the caseworker admitted that she continued to provide him with referrals for Franklin County when he lived in Youngstown and he effectively had to work the case plan on his own. B.R. similarly argues the agency never gave "V.W. a referral to [B.R.] to establish housing in the county in which she resided," and adds that the caseworker had no knowledge as to why further efforts were not made to place V.W. with another family member, S.P. (Brief of Appellant B.R. at 12.)

{¶ 45} FCCS counters that the trial court was not required to make reasonable efforts findings since it had already made that determination prior to the permanent

custody hearing and since exceptions apply under R.C. 2151.419(A)(2)(d) (abandonment by R.W. while incarcerated), (A)(2)(e) (sibling of V.W. involuntarily placed into permanent custody of FCCS), and R.C. 2151.419(A)(2)(a)(iii) (B.R.'s guilty plea to child endangering under R.C. 2919.22 involving a sibling of V.W.).  FCCS adds, in the alternative, that the trial court did not err in determining FCCS did make reasonable efforts to reunify V.W. with B.R. and R.W.

{¶ 46} We agree with FCCS.  Initially, it does appear that this case involves exceptions that relieve FCCS of its burden to prove it made reasonable efforts at reunification under R.C. 2151.419(A)(1).  B.R. does not dispute that she had her parental rights involuntarily terminated with respect to a sibling of V.W., and R.W. fails to rebut the presumption he abandoned V.W. while he was incarcerated for more than 90 days with his bare statement that he did not abandon V.W. "intentionally."  (Brief of Appellant R.W. at 21.)  *See* R.C. 2151.011(C) ("For the purposes of this chapter, a child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days."); *In re L.M.*, 6th Dist. No. L-16-1212, 2017-Ohio-610, ¶ 27-28 ("This provision creates a presumption of abandonment, which may be rebutted"), citing *In re S.B.*, 183 Ohio App.3d 300, 2009-Ohio-3619, ¶ 33 (10th Dist.); *In re M.A.*, 10th Dist. No. 20AP-345, 2021-Ohio-1078, ¶ 51 (noting that a parent's intent to relinquish parental rights is irrelevant to a determination of abandonment under R.C. 2151.011(C)).

{¶ 47} Regardless, FCCS did attempt to engage in efforts to reunify V.W. with both appellants, and the trial court in this case did not rely on any R.C. 2151.419(A)(2) exception but instead assessed FCCS's efforts to reunify V.W. with B.R. and R.W. and determined those efforts to be reasonable.  As indicated by FCCS, the trial court made this determination prior to the August 2021 permanent custody hearing.  Specifically, on June 25, 2020, following a hearing, the trial court adopted a magistrate's decision, without objection, finding reasonable efforts had been made by FCCS to prevent or eliminate the need for removal of V.W. from the home, and that although placement and casework services were provided by FCCS to the family of the child, the removal of V.W from home continued to be necessary because the circumstances giving rise to the original filing had not been sufficiently alleviated.  These findings satisfy the reasonable efforts requirement

under R.C. 2151.419(A)(1), and the trial court was not obligated to make a fresh determination on this issue in its August 2021 decision. *In re K.D.* at ¶ 51 (determining reasonable efforts requirement satisfied by trial court decision indicating FCCS made reasonable efforts to prevent the continued removal of the child from the home, biological father was not participating in case services at that time and had a criminal background including sexual abuse of a minor); *In re A.N.F.*, 10th Dist. No. 17AP-905, 2018-Ohio-3689, ¶ 22 (determining reasonable efforts requirement satisfied by trial court decision indicating "[c]ontinuation in the child's own home would be contrary to the child's welfare and that reasonable efforts have been made to prevent or eliminate the need for removal of said child from the child's own home").

{¶ 48} "We cannot reverse a judgment based on an alleged error in a finding that the trial court never had to make in the first place." *In re J.H.*, 10th Dist. No. 19AP-517, 2021-Ohio-807, ¶ 66. Nevertheless, we agree that the record of this case supports the trial court's conclusion that FCCS made reasonable efforts to reunify V.W. with B.R. and/or R.W. As discussed by the trial court, this family has a long history of involvement with child protective services stemming from issues surrounding V.W.'s older sister. FCCS developed case plans, which were adopted by the court, with the goal of reunifying V.W. with B.R. and R.W. B.R. and R.W. testified the caseworker reviewed the case plan with them. The record shows that FCCS made efforts to assist appellants in possibly reunifying with V.W. While appellants take issue with FCCS not providing enough referral assistance outside of Franklin County, the caseworker explained that R.W. had indicated an intent to move to Franklin County and B.R. reported that she had been placed on a waiting list for housing and did not seek further assistance. Neither R.W. nor B.R. provide legal authority pertaining to provision of services and referrals to biological parents who do not reside in the county where the child is placed. *State v. Hubbard*, 10th Dist. No. 11AP-945, 2013-Ohio-2735, ¶ 34 ("An appellant must support their assignments of error with an argument, which includes citation to legal authority"), citing App.R. 16(A)(7) and App.R. 12(A)(2). Furthermore, B.R. does not explain how FCCS's (purported) lack of consideration of S.P. as a (once) prospective placement is relevant to FCCS's efforts to reunify V.W. with B.R. to support this assignment of error.

{¶ 49} Based on the record of this case, FCCS made reasonable efforts under the circumstances to facilitate B.R. and R.W.'s participation in the case plan in order to reunite with V.W. R.W. and B.R.'s arguments to the contrary lack merit.

{¶ 50} Accordingly, considering all the above, we overrule R.W.'s second assignment of error and B.R.'s third assignment of error.

### (2) Reliance on R.C. 2151.141(B)(2) (R.W.'s first assignment of error)

{¶ 51} R.W. contends the trial court erred "insofar as it relied on" R.C. 2151.414(B)(2). (Brief of Appellant R.W. at 15.) Our review of the trial court's decision shows the trial court cited R.C. 2151.414(B)(2) as a part of the statutory framework but did not rely on R.C. 2151.414(B)(2) as the basis for its decision to grant permanent custody to FCCS. Specifically, the trial court does not expressly make any findings under this section, and in its conclusions of law the trial court made its determination regarding permanent custody under "at least one" section of R.C. 2151.414(B)(1). (Decision & Entry at 20.) Therefore, R.W.'s first assignment of error is contrary to the record and lacks merit.

{¶ 52} Accordingly, we overrule R.W.'s first assignment of error.

### (3) Placement with B.R. within a reasonable time (B.R.'s first assignment of error)

{¶ 53} B.R. contends there is an insufficient factual basis to determine that V.W. could not be placed in her care within a reasonable time since she made "substantial efforts with respect to her reunification plan[.]" (Brief of Appellant B.R. at 6.) Although B.R. does not cite a statutory provision, we assume she refers to the trial court's determination that V.W. could not be placed with B.R. within a reasonable time to satisfy R.C. 2151.414(B)(1)(a). This statute section is one of five alternative factors that must be met as a first step to determining a permanent custody motion. *In re A.S.*, 10th Dist. No. 20AP-93, 2021-Ohio-218, ¶ 20 ("In deciding to award permanent custody, the trial court must take a two-step approach * * * The court must first determine if any of the factors set forth in R.C. 2151.414(B)(1) apply.")

{¶ 54} Here, in addition to determining V.W. "cannot be placed with either of her parents within a reasonable time" under R.C. 2151.414(B)(1)(a), the trial court also held the "twelve or more months of a consecutive twenty-two month period" factor described in R.C.

2151.414(B)(1)(d) applies.  (Decision & Entry at 12.)  B.R. does not assign the trial court's R.C. 2151.414(B)(1)(d) determination as error or otherwise challenge that holding.[2]

{¶ 55} In such circumstances, this court has determined the issue of whether a child cannot or should not be placed with a parent within a reasonable time is moot and the determinative issue becomes the best interests of the child. *In re K.J.*, 10th Dist. No. 19AP-727, 2020-Ohio-4391, ¶ 31 (finding assignment of error concerning placement of the child with the mother to be "moot" where the mother did not challenge the finding that the child had been in the custody of FCCS for 12 or more months of the consecutive 22-month period under R.C. 2151.414(B)(1)(d)); *In re T.W.*, 10th Dist. No. 10AP-897, 2011-Ohio-903, ¶ 51-52 ("[W]hen R.C. 2151.414(B)(1)(d) has been satisfied, it is unnecessary for the trial court to analyze when a child could or should be placed with either parent and [the appellate court] need not consider such extraneous findings as to R.C. 2151.414(B)(1)(a)."); *In re M.W.*, 10th Dist. No. 19AP-769, 2020-Ohio-5199, ¶ 17-18 (proceeding to best interests of the child determination where mother did not dispute the trial court's conclusion that the child was in the temporary custody of FCCS for more than 12 months out of a consecutive 22-month period under R.C. 2151.414(B)(1)(d)).  *See also In re N.D.*, 2d Dist. No. 28687, 2020-Ohio-3203, ¶ 18 (finding that since "there was no dispute that [the child] had been in the temporary custody of [the agency] for 12 or more months of a consecutive 22-month period," the agency "only needed to establish that an award of permanent custody to the agency was in N.D.'s best interest").

{¶ 56} Moreover, while the trial court was not obligated to make the alternative holding that V.W. could not be placed with B.R. within a reasonable time, our review shows the trial court's determination in that regard is not against the manifest weight of the evidence. *See In re T.W.* at ¶ 51 ("A trial court is not limited to making only the minimum number of required findings in any given case, and it remains free to make additional findings if it so chooses."); *In re K.J.* at ¶ 35 (discussing appropriateness of trial court's R.C. 2151.414(B)(1)(a) determination "[e]ven if the issue is not moot[.]").

{¶ 57} R.C. 2151.414 states that, "[i]f the court determines, by clear and convincing evidence, at a [R.C. 2151.414(A) hearing] * * * that one or more" of a list of factors exist, "the court shall enter a finding that the child cannot be placed with either parent within a

---

[2] We note R.W. expressly concedes R.C. 2151.414(B)(1)(d) is met.

reasonable time or should not be placed with either parent." R.C. 2151.414(E). Here, the trial court found R.C. 2151.414(E)(1); R.C. 2151.414(E)(7)(c); R.C. 2151.414(E)(11); and R.C. 2151.414(E)(16). B.R. does not challenge the trial court's findings under R.C. 2151.414(E)(7)(c) and R.C. 2151.414(E)(11), which concern an endangering children conviction and having parental rights terminated with respect to a sibling. Therefore, these findings alone support the trial court's determination that V.W. could not be placed with B.R. within a reasonable time or should not be placed with B.R. The trial court's determination that R.C. 2151.414(E)(1) was met is also supported by this record, which clearly shows B.R. "failed continuously and repeatedly to substantially remedy" her chronic lack of housing. R.C. 2151.414(E)(1).

{¶ 58} Accordingly, we overrule B.R.'s first assignment of error.

**(4) Best interests of V.W. (R.W.'s fourth assignment of error, B.R.'s second and fourth assignments of error)**

{¶ 59} After a trial court determines at least one of the factors set forth in R.C. 2151.414(B)(1) applies, the trial court must then determine, by clear and convincing evidence, whether a grant of permanent custody is in the best interest of the child. *In re A.J.*, 10th Dist. No. 13AP-864, 2014-Ohio-2734, ¶ 16; R.C. 2151.414(B)(1). In determining the best interest of a child, R.C. 2151.414(D)(1) directs that the trial court must consider all relevant factors including, but not limited to, the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

" 'R.C. 2151.414(D) does not give any one factor 'greater weight than the others.' " *In re M.T.*, 10th Dist. No. 19AP-344, 2020-Ohio-2950, ¶ 17, quoting *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, ¶ 56.

{¶ 60} The trial court considered each factor and ultimately determined that clear and convincing evidence showed granting FCCS permanent custody was in the best interests of V.W. We agree.

{¶ 61} Under R.C. 2151.414(D)(1)(a), in making its best interest determination, the trial court must consider the interactions and relationships between the child and the individuals in the child's life, including the child's parents, siblings, relatives, and "any other person who may significantly affect the child." The evidence here showed a bond between V.W. and B.R. and a developing bond between V.W. and R.W., and each parent was reported to behave appropriately with V.W. at visitations. However, the evidence also showed a very strong bond between V.W. and her foster mother, her foster siblings, and her older sister B.R.R., who is in the permanent custody of FCCS and in the care of the foster mom. The evidence shows V.W. is happy and very well cared for in her foster home placement. V.W. did not have a strong bond with her other siblings.

{¶ 62} R.C. 2151.414(D)(1)(b) required the trial court to consider V.W.'s wishes, expressed either directly or through the child's guardian ad litem. Here, the GAL testified that V.W., who was approximately two and one-half years old at the time of the hearing, is not capable of expressing her wishes, but she is "very, very happy in [her foster] household" and testified that it was in V.W.'s best interest for FCCS to be granted permanent custody for purposes of adoption with her foster family. (Aug. 16, 2021 Tr. at 38.) The trial court found V.W. to be "too young and too immature to understand the nature of these proceedings and/or to articulate her wishes." (Decision & Entry at 19.) As another relevant best interest factor, the trial court cited the GAL's opinion that it is in V.W.'s best interest for permanent custody to be granted to FCCS for the purposes of adoption.

{¶ 63} B.R. contends that the trial court's decision should be reversed because there is no clear and convincing evidence as to V.W.'s wishes. Contrary to this argument, this court previously found where the record affirmatively shows that a child not capable of communicating wishes, as is the case here, the trial court is excused from considering the child's wishes and may rely on insights of the GAL. *In re J.W.*, 10th Dist. No. 06AP-864, 2007-Ohio-1419, ¶ 18, citing *In re Wright*, 10th Dist. No. 04AP-435, 2004-Ohio-4045, ¶ 12. *See, e.g., In re Schaefer* ¶ 60 (finding trial court satisfied its statutory duty when it found that at 14 months of age, the child was too immature to articulate his wishes, but noted that the guardian ad litem had testified that it was in the best interest of the child that permanent custody be granted to GCJFS so that the child could be adopted by his foster family); *In re Lopez,* 166 Ohio App.3d 688, 2006-Ohio-2251, ¶ 37 (3d Dist.) (determining that trial court's finding that two- and three-year old children were too young to express their wishes was supported by the record and permanent custody to the agency was appropriate for those children, but that the trial court's same finding regarding a five-year old child's wishes was not supported by clear and convincing evidence and, therefore, the trial court's grant of permanent custody of the older child should be reversed). Having reviewed this record, we find the GAL competent, and find B.R.'s argument as to R.C. 2151.414(D)(1)(b) to lack merit.

{¶ 64} Under R.C. 2151.414(D)(1)(c), the trial court must consider the custodial history of the child. V.W. has been out of her biological parents' care since April 2019, when she was removed when she was only a few months old and was adjudicated neglected and dependent in June 2019. She has been in the same foster placement since May 2019, where three of her siblings also reside. Neither party challenges the trial court's findings under this factor nor argues against its applicability in favor of the permanent custody determination.

{¶ 65} R.C. 2151.414(D)(1)(d) addresses the child's need for a legally secure permanent placement and required the trial court to consider whether this can be achieved without a grant of permanent custody to FCCS. The record supports both aspects of this section. At the time of the hearing, V.W. had her future subject to uncertainty for over two years. The GAL, who has been involved with appellants even prior to V.W.'s birth, testified for the need for a secure, permanent home for V.W. and emphasized that V.W. has the

opportunity to secure a future with her older sister and younger twin siblings with a foster mother she is very bonded to. *See In re K.J.* at ¶ 25 ("K.J.'s interactions and interrelationships show a mother-child bond with her foster mother that could meet the need for permanency described by her GAL.").

{¶ 66} Further, no relatives sought custody of V.W.; S.P.'s motion was dismissed for failure to prosecute. Contrary to B.R.'s argument, the record supports the trial court's finding that B.R. could not meet V.W.'s needs for a legally secure permanent home. Namely, a review of the record and testimony clearly shows B.R. is unlikely to gain, and keep, suitable housing. This finding is not premature, as suggested without legal support by B.R.; no party suggests FCCS lacked statutory authority to move for permanent custody, and in this case, the record clearly shows B.R. is not a viable option to give V.W. the legally secure home that she needs.

{¶ 67} Moreover, appellants' prior convictions, which include endangering children for B.R. arising out of an injury to B.R.R. and unlawful sexual conduct with a minor for R.W., present ongoing serious concerns about whether either appellant can safely care for V.W. (as testified to by the GAL and the caseworker) and legal barriers to regaining custody of her. The trial court found R.W. had not started any process to attempt to remove legal barriers to having custody of V.W. and "cannot demonstrate a reasonable assurance that he will be able to until at least October 2023." (Decision & Entry at 19.) R.W. challenges the trial court's finding regarding the legal impediment of his inability to have unsupervised contact with minors poses to gaining custody of V.W.

{¶ 68} This challenge fails. While R.W.'s parole officer believed it was "possible" R.W's release date could be shortened, he also noted he would "have to check on that again" to make sure. (Aug. 16, 2021 Tr. at 25.) Ms. Peters-Freeman unequivocally stated R.W. is not eligible for a reduction in supervision. *In re M.W.* at ¶ 42 (emphasizing that the weight to be given the evidence and the credibility of the witnesses are primarily questions to be answered by the trier of fact). R.W. admits the testimony by Ms. Peters-Freeman described a complicated process to have restrictions changed and does not dispute he had not started that process. R.W.'s suggestion that Ms. Peters-Freeman also described an easier process that was "much easier" to go from supervised to unsupervised contact both defies logic and does not reflect the testimony of Ms. Peters-Freeman, who appears to have thought the

question addressed the process to "approve * * * supervised contacts" on a limited, visit-to-visit basis. (Brief of Appellant R.W. at 23; Aug. 2, 2021 Tr. at 15.) To the extent R.W. argues the parole board would "go along with whatever the court approved in terms of visitation," the trial court here evidently did not decide altering his visitation restrictions was in the best interest of V.W. and instead, appropriately determined that this record showed granting FCCS permanent custody for purposes of adoption is in V.W.'s best interest. (Decision & Entry at 23.)

{¶ 69} Under this factor, R.W. also submits that, "[b]ut for the supervision restriction, father was a viable placement." (Brief of Appellant R.W. at 24.) The record shows otherwise. R.W. has a concerning criminal history, including unlawful sexual conduct with a minor, and a willingness to violate restrictions of his parole, even when doing so may jeopardize the safety of his children. *See In re S.D.*, 10th Dist. No. 08AP-546, 2009-Ohio-1047, ¶ 14 ("[H]is history of domestic violence made him a questionable placement, even if he had completed his incarceration."). The GAL testified to having concerns R.W. had not changed his ways and to believing rules did not apply to him, and did not recommend V.W. be placed with R.W. Moreover, even though R.W. completed case plan elements, "R.C. 2151.414(D) does not require courts to deny a children services agency's motion for permanent custody solely by virtue of a parent's substantial compliance with the case plan." *In re A.S.* at ¶ 23, citations omitted. Contrary to R.W.'s argument, the record supports the trial court's finding that he could not meet V.W.'s need for a legally secure permanent home.

{¶ 70} Lastly, under R.C. 2151.414(D)(1)(e), the court was required to consider whether any of the factors in R.C. 2151.414(E)(7) to (11) apply, which include: whether the parent has been convicted of or pled guilty to certain crimes; whether the parent withheld medical treatment or food from the child; whether the parent has placed the child at a substantial risk of harm due to alcohol or drugs; whether the parent has abandoned the child; and whether the parent has had parental rights terminated with respect to a sibling of the child. The trial court found R.W. legally abandoned V.W. and B.R. was convicted under R.C. 2919.22. Neither appellant presents a legal supported argument to the contrary.

{¶ 71} Overall, we find the trial court thoroughly reviewed and weighed the evidence in relation to all factors relevant to determining whether granting permanent custody to

FCCS was in the best interest of V.W. Competent, credible evidence supported the trial court's conclusion that granting permanent custody to FCCS was in V.W.'s best interest. As a result, we find that the manifest weight of the evidence supports the trial court's determination of the best interest of the child under R.C. 2151.414(B)(1) and (D).

{¶ 72} Accordingly, we overrule R.W.'s fourth assignment of error and B.R.'s second and fourth assignments of error.

### (5) Placement with R.W.'s relative (R.W.'s third assignment of error)

{¶ 73} R.W. contends the trial court abused its discretion in "dismissing the possibility of placement with [his] relatives." (Brief of Appellant R.W. at iii, 16.) According to R.W., he testified that he had sisters who lived near him and were looking forward to helping him care for V.W., suggested a relative for placement, and contends FCCS admitted they failed to follow up on or investigate these leads. R.W. acknowledges that "some courts have held that there is no statutory duty to make reasonable efforts to place children with relatives[,]" but asserts that R.C. 2151.412 establishes guidelines that create a priority on placement with relatives while in temporary custody and the child's relationship with relatives is a factor to consider in the best interests determination. (Brief of Appellant R.W. at 17.)

{¶ 74} R.W. cites to, and attempts to distinguish this case from, *In re S.D.*, which found the trial court did not abuse its discretion by granting permanent custody of a child to FCCS without requiring a more diligent effort to find a potential placement with a relative. R.W. believes the case is different since the trial court here did not acknowledge FCCS's (purported) failure to investigate placement with R.W.'s relatives, and concluded FCCS made reasonable efforts to identify, locate, and approve placements with relatives despite contrary evidence in the form of the caseworker's admission otherwise. R.W. also contends that unlike *In re S.D.*, R.W. completed the case plan and therefore the child's interest weighs more in favor of maintaining familial bonds and a potential reunification with father.

{¶ 75} FCCS argues that we should follow *In re S.D.* in this case. FCCS contends that, as in *In re S.D.*, there were no motions from any relatives for custody of the child and V.W. is receiving good care from the long-term foster placement. FCCS also argues that even if a relative appeared, it is unlikely placement with that relative would be in V.W.'s

best interest since V.W. is placed in the same, stable household as three of her siblings and that placement is a possible adoptive home. FCCS notes R.W. did not raise the existence of relatives at trial or ask for a continuance to pursue relatives as placements.

{¶ 76} On the record of this case, we agree with FCCS. First, the trial court does not have a duty to find by clear and convincing evidence that no suitable relative was available for placement. *In re Schaefer* at ¶ 64. In other words, "while biological relationships may be important considerations, they are not controlling when ascertaining a child's best interest." *In re C.M.*, 4th Dist. No. 17CA16, 2017-Ohio-9037, ¶ 86.

{¶ 77} Second, it is unclear from the record whether R.W. suggested a relative to FCCS to investigate and the record does not show, as R.W. suggests, that FCCS then failed to undertake a related investigation. The caseworker had no personal knowledge of an investigation into R.W.'s relatives, but also said that effort was assigned to a specific kinship department. We do not find the record establishes FCCS failed to investigate R.W.'s family for possible placements.

{¶ 78} Third, we find *In re S.D.* supports FCCS's position. Like *In re S.D.*, at the date of the final hearing, no relative had presented himself or herself as a potential placement, V.W. had received good care in the foster home after a failed attempt to place her in the custody of a relative, and, as indicated in addressing the best interests issue above, the record indicates that the trial court considered the evidence presented and found by clear and convincing evidence that FCCS should be granted permanent custody of V.W. As in *In re S.D.*, we do not find the trial court abused its discretion in not considering placement with a relative of R.W. under these circumstances.

{¶ 79} Accordingly, we overrule R.W.'s third assignment of error.

## V. CONCLUSION

{¶ 80} Overall, the trial court decision to grant FCCS permanent custody of V.W. is not against the manifest weight of the evidence. Having overruled R.W.'s four assignments of error and B.R.'s four assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations and Juvenile Branch.

*Judgment affirmed.*

LUPER SCHUSTER, P.J., and DORRIAN, JJ., concur.

_____